Dairymen's Co-Operative Sales Assn. *v.* P. S. C.

Argued May 4, 1934.

Before Trexler, P. J., Keller, Cunningham, Baldrige, Stadtfeld and Parker, JJ.

*E. Lowry Humes,* for Dairymen's Co-Operative Sales Association, appellant, cited: Blakiston v. Davis, Turner & Co., 42 Pa. Superior Ct. 397; Frantz v. Public Service Commission, 93 Pa. Superior Ct. 416; Davis v. Commission, 79 Colo. 642, 247 Pacific 801; Hissem v. Guran, 112 O. S. 59, 146 N. E. 808.

*Paul H. Rhoads,* and with him *Samuel Graff Miller,* Legal Assistants, *E. Everett Mather, Jr.,* Assistant Counsel and *John Fox Weiss,* Counsel, for the Public Service Commission, appellee.

*D. I. McAlister* of *Hughes & McAlister* for Tri-State Milk Haulers Association, intervenors.

*John B. Nicklas, Jr.,* of *McCrady, McClure, Nicklas & Hirschfield,* and with him *John L. Wilson,* attorneys for Michael Doman and W. D. Rubright, intervenors.

*D. I. McAlister* of *Hughes & McAlister,* for Oliver B. Robinson, trading and doing busines as Robinson Bros., intervenor.

OPINION BY PARKER, J., October 3, 1934:
These three appeals involve the same questions and

will be disposed of in one opinion. The proceedings were initiated by a complaint against J. L. Townsend and Son and two complaints against W. E. Burket. The complainants, holders of certificates of public convenience issued by the Public Service Commission authorizing the transportation of merchandise and goods between various points in the vicinity of Pittsburgh, charged, in substantially the same language, that the respondents were operating as common carriers in their territory without procuring a certificate of public convenience. The commission, after hearings, sustained the charges and issued an order directing the respondents to desist from transporting property as common carriers until they received a certificate. The Dairymen's Co-operative Sales Association was permitted to intervene in the proceedings before the commission on behalf of the respondents, and the Tri-State Milk Haulers' Association was permitted to intervene in support of the order.

The Dairymen's Co-operative Sales Association, a corporation organized under Act of Assembly approved April 30, 1929, P. L. 885 (14 PS 81), began business April 1, 1932, succeeding the operations of the Dairymen's Co-operative Sales Company, organized under the laws of Ohio. The Ohio corporation was liquidated and its members are now members and stockholders in this association, which was organized "for the purpose of buying, selling and dealing in farm and dairy products; pasteurizing and manufacturing milk into butter, cheese, condensed milk, powdered milk and by-products and selling the same;" buying and selling agricultural implements, farming supplies generally, and distributing the same to its stockholders at cost. The business of the association as actually conducted has not been carried on for profit to it and, so far as the facts affect the matters

involved in this appeal, has consisted in finding a market for milk and cream and providing means of transportation for those products from the producer to the market. The buyers with whom the association has dealt have been consumers in large quantities, ice cream manufacturers, cheese makers, and the like. The association has now 17,000 stockholders in western Pennsylvania, northern West Virginia, and eastern Ohio.

The producer, upon becoming a member of the association, enters into an agreement with it whereby, inter alia, he agrees to consign to the association all the milk and cream produced upon his farm, except such as he might give away or retain for home consumption, and the association undertook to find a market for the products. The contract contained this provision: "The Producer agrees to make delivery of said milk and cream by such haulers or carriers and by the use of such hauling equipment and facilities as are approved by said Association."

In April, 1933, the association, after advertising for bids, entered into three-party agreements with a number of its stockholders located in a district and certain truckers including Townsend and Son and Burket. The stockholders by executing the agreement indicated their assent to the terms of the particular agreement, although such written assent was not a necessary condition in the making of a hauling agreement by the association. The hauling contracts were for periods of one year and provided that the hauler should collect daily the milk and cream consigned for sale, by such of the stockholders as the association designated and who accepted the contracts, and deliver the same to the buyer or buyers designated by the association, and thereafter return to the stockholders the containers, for which service the trucker was to receive eighteen

cents per hundred weight. The association, on sale of the milk and cream, had the right to receive the price paid for account of the producer but, to save expense, had the buyer remit directly to the producer on apportionments made by the association. The buyer deducted from the amount due the producer the hauling charges and a commission due the association. Of such hauling charges, six-tenths of one per centum were retained by the association and the balance paid by it to the trucker. As a result the producer actually paid the hauling charges. The hauling contract also provided that the carrier should not ''solicit or receive for transportation or sale milk from stockholders or others not specifically designated by the first party [the association],'' and the trucker agreed to ''haul, handle or transport while in the performance of this contract, no produce, commodities or articles not specifically provided for under the terms of this contract.''

It is a matter of common knowledge that milk is a fertile medium for the development of bacteria and that to meet proper sanitary requirements, it is essential that the transportation of milk be expedited and its quality thus preserved. These facts necessitate the use of special equipment and other safeguards not only in the production, but also in the transportation of milk for human consumption. To accomplish the purposes of the association it must be in a position to protect the price of milk and make possible the prompt and effective diversion or transfer of milk from one market to another in order to guard against surpluses that accumulate in seasons of plenty. The parties recognized these conditions in their contracts when they became members of the association and authorized the association, under certain circumstances, to divert the milk so that it would not be used as fluid milk, but sold and delivered at different places to

dairies and other buyers who manufacture the milk into such products as cheese, ice cream, powdered milk, and the like. This made necessary, the association contends, the securing of a means of transportation which was more flexible than was provided by common carriers with fixed routes or who operated in restricted territory.

There was some evidence offered as to hauling done for others than members of the association, but the commission in its opinion based its conclusions largely, if not entirely, on the dealings of respondents with the members, saying: "Although there is some evidence that both of the respondents have hauled milk for producers which were not members of the Association, the commission is of the opinion that even though the carriage were restricted to the hauling of milk for members only, a sufficiently large portion of the public would be served and offered the service of the respondents to constitute them common carriers." We will, therefore, first examine the dealings among the association, the respondents, and the members of the association.

"In order to subject the appellant [respondent] to the jurisdiction of the commission, it must be made to appear that he is a common carrier; that is, that he undertakes to carry for hire all persons indifferently who apply to him": Harder v. P. S. C., 90 Pa. Superior Ct. 373, 375; Frantz v. P. S. C., 93 Pa. Superior Ct. 416. The commission assumed jurisdiction of this controversy under the public service company law enacted to regulate public utilities, and not by virtue of any legislation based on the right of the Commonwealth to regulate the use of its highways, a right which the Commonwealth possesses. It is true, however, that the legislature cannot "by mere legislative fiat" convert a private carrier into a public utility or make

such owner a common carrier, for to do so would be in violation of the due process clause of the federal constitution: Frost v. R. R. Commission, 271 U. S. 583, 48 S. Ct. 605; Producers Trans. Co. v. R. R. Commission, 251 U. S. 228, 230; Michigan Commission v. Duke, 266 U. S. 570, 577, 578.

In Gordon v. Hutchinson, 1 W. & S. 285, Chief Justice GIBSON said that "any man undertaking to carry the goods of all persons indifferently" is a common carrier. A similar definition and the one usually accepted is that given by the Chief Justice of Massachusetts in Dwight v. Brewster, 18 Mass. 50: "A common carrier is one who undertakes, for hire or reward, to transport the goods of such as choose to employ him, from place to place." This definition has been approved by our Supreme Court in Beckman v. Shouse, 5 Rawle 179, and by this court in Blakiston v. Davies, Turner & Co., 42 Pa. Superior Ct. 390, 397. "We express a doctrine universally sanctioned when we say, that any one who holds himself out to the public as ready to undertake for hire or reward the transportation of goods from place to place, and so invites custom of the public, is in the estimation of the law a common carrier": Lloyd v. Haugh, 223 Pa. 148, 154, 72 A. 516. There are, however, enlargements and limitations of the general terms of these definitions. "No carrier serves all the public. His customers are limited by place, requirements, ability to pay and other facts. The public does not mean everybody all the time": Piercely v. P. S. C., 73 Pa. Superior Ct. 212, 214. The status of one as a common carrier is not changed by an occasional refusal to perform services for which he is equipped or by the fact that he does not advertise, and the fact that one makes written contracts with his patrons is not controlling in determining that question: Erb v. P. S. C., 93 Superior Ct.

421; Bingaman v. P. S. C., 105 Pa. Superior Ct. 272, 161 A. 892. "What constitutes a common carrier is a question of law but whether one charged with being a common carrier has by his method of operation brought himself within that definition is a question of fact to be determined from the evidence in each case as it arises": Erb v. P. S. C., supra, p. 429. Mere schemes or devices to avoid the duties and responsibilities of a common carrier are impotent for the purpose intended when the true character of such acts is established: Bingaman v. P. S. C., supra; Davis v. Com., 79 Colo. 642, 247 Pac. 801; Goldsworthy v. Maloy, 141 Md. 674, 119 A. 693.

In order to bring the respondents within the purview of the Public Service Commission Act of 1913 and its amendments, it must, as we have seen, be made to appear that they have voluntarily devoted their transportation facilities to the indiscriminate use, at least within the limits of the facilities possessed by them, by the public for hire and have thus become common carriers, for they do not possess the right of eminent domain or possess other similar characteristic which would of itself indicate that their properties had been devoted to a public service. As was pointed out in the case of Hostetter v. P. S. C., 110 Pa. Superior Ct. 212, 219, 168 A. 493, the control of common carriers engaged in transportation on the public highways presents problems and difficulties different from that of those engaged as railroads or pipe lines which are less in number and less mobile. The problem must therefore be approached with these differences in mind.

The undertaking of these respondents to haul the milk consigned by members to the association for sale is not of itself, as we see it, an undertaking to haul milk even from that fixed territory to the place of

delivery for all indifferently who may wish to have such service: Toth v. P. S. C., 73 Pa. Superior Ct. 217; Harder v. P. S. C., supra; Beatty v. P. S. C., 110 Pa. Superior Ct. 461, 169 A. 21; Frantz v. P. S. C., supra. The devotion of a carrier's facilities to the service of one person is not an offer to haul for all. Certainly it would not be contended that if a large department store in Pittsburgh or Philadelphia, making extensive deliveries of goods to customers in the city and counties of the section of the state in which it is located, should contract with an individual or corporation to make deliveries for such store alone and as the exclusive business of the carrier, the carrier would by so doing even impliedly undertake to haul for all the public indifferently. Neither do we believe that it could be successfully urged that this association could not, without securing a certificate of public convenience, operate its own trucks for the purpose of gathering the milk of stockholders of the association exclusively: Uncle Sam Oil Co. v. U. S., 234 U. S. 548, 561.

But it is suggested that the respondents were hauling not for the association but for the individual members, since the producer paid the transportation charges, and that this service constituted such a substantial portion of the traffic that it amounted to an offer to serve all. The prime purpose of such organizations as the Dairymen's Co-operative Sales Association, as expressed in its title and the title to the act under which it is organized, is co-operation. For that purpose, such organizations are chartered with the power as agents for their stockholders to sell and market as a unit. The relationship created is not that of buyer and seller who deal as strangers, but rather one where many small producers are brought together for the express purpose of common action. Such is the very essence of the transaction.

In determining the character of a carrier's operations, the courts have frequently taken into account the number of persons accommodated by the carrier and the proportion of the available business which the carrier enjoys (The Pipe Line Cases, Ohio Oil Co. v. U. S., 234 U. S. 548), and the appellees here contend that the possible scope of the operations of this association among its 17,000 members is so large as to make the service a public one. The answer to this contention is that the legislature has authorized such combinations as we are here considering. In the public interest there has been additional legislation dealing with the production and sale of milk, and the legislature has declared that the "production, transportation, manufacture, processing, storage, distribution, and sale of milk in the Commonwealth is a business affecting the public health and affected with a public interest" (Act of Sp. Session 1933, P. L. 174), and placed such operations of the milk industry under the supervision of the Milk Control Board. The United States Supreme Court, in Nebbia v. N. Y., 291 U. S. 502, held constitutional somewhat similar legislation. It may be assumed that the legislature did not intend that an association acting within the authority conferred upon it by its charter and in harmony with later legislation on the same subject should be prevented from accomplishing the purpose for which it was incorporated, or that when a body of milk producers took advantage of such legislation and the resulting corporation contracted with the trucker for the performance of the various services contemplated by the legislature, they should be accused of adopting a scheme or subterfuge to avoid the duties of a common carrier. There is nothing inconsistent with this view in the fact that the Milk Control Act of 1933 provided that nothing therein should "be construed to alter, amend, or repeal the Public Service Company Law."

These associations may, and doubtless will, employ common carriers at times and such operations will be, as heretofore, under the control of the commission. We do not regard the fact that the producer paid the carrying charges as of importance in determining the true relationship of these respondents to the public. It follows that unless there is something else to show that this plan was a mere scheme, device, or subterfuge to avoid the duties and responsibilities of a common carrier, the commission was without jurisdiction.

As we have pointed out, a carrier, by entering into special written contracts or refusing to serve some persons, may not by such subterfuges avoid regulation, but there is here no evidence of any such plan. The association sought individuals to carry the goods furnished by the producers. It, not the carriers, devised the plan adopted. It entered into contracts in which the carrier was required to agree that while in the performance of the contract he would not haul products, commodities, or articles not provided for under the terms of the contract, and that he would not solicit or receive such articles for transportation from persons not designated by the association. This rebuts any possible inference of an attempt to conceal the true nature of the transaction and is inconsistent with the carrier being a common carrier, for it must be borne in mind that when one becomes a common carrier he is not only subject to regulation but owes a duty to the public by way of service. In addition, it appears that for the purpose of effecting the primary objects of the association it is necessary that the service be more flexible than that which would in practice be furnished by a common carrier where the territory served and the facilities furnished are necessarily controlled by certificates of public convenience with special provisions and limitations. Finally, as suggested by counsel for the association,

it is doubtful whether in many places the association could function without some such arrangement as has been here undertaken. It would not be practicable for a farmer in Butler, Mercer, or Crawford County to transport his own milk to Pittsburgh unless he produced large quantities. Perhaps there might be a common carrier operating from some points in each county to Pittsburgh, but the others would not be accommodated and if, as occurs three hundred times each month, it should become necessary to shift the delivery to another dairy or cheese factory, a special arrangement would necessarily have to be made as to each shipment. Remembering the perishable qualities of milk and cream, it becomes evident that the arrangement is a reasonable one vitally essential to the successful operation of the co-operative plan without a suggestion of a scheme to avoid a public duty. Insofar as the evidence concerned the services furnished by the carrier to the stockholders of the association, it furnished no basis for a finding that the respondents were common carriers.

The conclusion at which we have arrived is precisely the same as that reached by the Supreme Court of Ohio in Hissem v. Guran, 112 Ohio 59, 146 N. E. 808. Also, see Associated Pipe Line Co. v. R. R. Commission, 169 Pac. 62, L. R. A. 1918 C, 849, where the same principles were applied to a pipe line company which did not possess the right of eminent domain and where The Pipe Line Cases, 234 U. S. 548, are distinguished. Our conclusions are also in harmony with the principles announced in cases involving mutual telephone companies.

The cases from other states cited by the appellees are easily distinguished from the case we are considering. Goldsworthy v. Maloy, supra, presented a situation where the defendant was holding himself out as a common carrier and is in precise agreement

with cases heretofore decided by this court, such as Piercely v. P. S. C., supra; Keystone Warehousing Co. v. P. S. C., 105 Pa. Superior Ct. 267, 161 A. 891; Erb v. P. S. C., supra, and Kline v. P. S. C., 93 Pa. Superior Ct. 430. In West v. Western Md. Dairy, 150 Md. 641, 135 A. 136, the defendant was operating a dairy for profit and purchased routes already operated under certificates. It then undertook to transport milk which was not its own but which it purchased from a dairy association after it was delivered in Baltimore. The case was ruled by the court of appeals of Maryland on the fact that the carrier was not transporting his own milk but that of others. P. U. C. of Ohio v. Boughtonville Farmers' Ex. Co., 40 Ohio App. 395, 178 N. E. 859, and Davis v. Com., supra, are both cases where the operator, by a subterfuge, sought to avoid the responsibilities of a common carrier. In each the scheme was most transparent.

In referring to testimony showing that respondents had transported merchandise other than milk, the commission said: "However, the commission is of the opinion that this testimony is not conclusive of the fact that the respondents have transported for hire anything other than milk, and has, therefore, given no weight to it in reaching its conclusion in these cases." In the case of Townsend, it appeared that milk was transported by him for three producers who had not signed a contract with the hauler, but who were members of the association. Such contracts, as we have pointed out, were not necessary under the agreement between the producer and the association. There is also some evidence that on several occasions the carrier, as an accommodation to a customer, brought from the city freezers of ice cream for which, it is asserted, no charge was made.

In the case of Burket, there was positive testimony that he had not hauled for any persons who were not

members of the association, but there was evidence that he solicited, at the request of the association, certain persons who were members of the association to sign a hauler's agreement, and that he called on a number of them to ascertain whether the milk would be delivered to him before the hauler's contracts were signed. The commission was undoubtedly correct in disregarding this testimony as it falls far short of showing any course of conduct that would amount to an offer to the public to carry indiscriminately.

The orders of the Public Service Commission at Nos. 268, 269, and 270 April Term, 1934, are reversed and it is directed that the complaints in each case be dismissed.