C. W. Allaman et al., Appellants, *v.* Pennsylvania
Public Utility Commission et al.

354

Argued May 1, 1942.

Be-
fore KELLER, P. J., CUNNINGHAM, BALDRIGE, RHODES,
HIRT and KENWORTHEY, JJ.

*Edward C. Breene,* of *Breene & Jobson,* with him
*Lloyd F. Weaver* and *A. A. Steffan,* for appellants.

*Thomas M. Kerrigan, Harry M. Showalter* and *Claude
T. Reno,* Attorney General, for Public Utility Commis-
sion.

*Richard L. Barnes,* with him *Seward H. French, Jr.*
and *Reed, Smith, Shaw & McClay,* for complainants,
intervening appellees.

*S. Knox Hunter, Jr.,* for *Penna. Retail Coal Merchants Assn.,* intervening appellee.

OPINION BY KELLER, P. J., July 23, 1942:

The Baltimore and Ohio Railroad Company, jointly with eight other railroad companies, in April 1940 filed a complaint with the Pennsylvania Public Utility Commission against C. W. Allaman, Francis Allaman and Eugene Allaman of Shippenville, Clarion County, Pennsylvania, which, as amended or supplemented, alleged that the respondents on or about April 24, 1940, May 20, 1940, June 22, 1940, and at other times, engaged in the business of common carrier, or contract carrier, by motor vehicle, in the transportation of coal between points in Clarion and Venango Counties, namely, from the Decker mine, Mechanicsville, Pennsylvania, State Route 66, Clarion County, to the Pennzoil Company plant, Rouseville, Venango County, without first having obtained requisite authority from the Pennsylvania Public Utility Commission, in violation of sections 201(b), 202(c) and 804 of the Pennsylvania Public Utility Law.

To this respondents filed an answer denying the averments in said complaint.

The matter was heard by the commission, which on October 28, 1941 entered an order sustaining the complaint and ordering the respondents to cease and desist from all transportation for compensation between points in the Commonwealth of Pennsylvania unless and until requisite authority be first secured from it.

Respondents appealed to this court.

The gist of the appeal lies in the finding of the commission sustaining the complaint of the petitioners. That complaint did not aver whether respondents were common carriers or contract carriers. The averment was in the alternative or disjunctive. Nor did the commission, in its order, find whether the respondents'

operations were those of a common carrier or of a contract carrier. The finding was:

"After full consideration of all the facts presented in this record, we have concluded, and therefore find, that the primary activity of respondents with regard to coal handled by them is the transportation of that coal. Since respondents' main activity in connection with coal handled by them is the moving of the coal from mines to the consumer, we find that the difference between the purchase price paid the producer, and the sale price to the consumer, represents an actual payment to respondents for transportation, and respondents' operations are, therefore, in fact those of a carrier;" not stating whether respondents were operating as a common carrier or a contract carrier.

The commission, however, stated: "There are no serious differences between the parties as to the basic facts in this case. The complainants charge and the respondents admit that respondents' trucks carried coal from the Decker Mine at Mechanicsville, Pennsylvania, to the Pennzoil Company at Rouseville, Pennsylvania ...... The parties differ only in the conclusion as to respondents' status which should be arrived at as a result of respondents' activities.

"The respondents maintain, in substance, that their business is that of a coal dealer and they transport coal only as an incident to their business. They maintain further that they hold a mercantile license to sell coal and have filed State and Federal Tax returns as dealers in coal. They supply coal to at least 50 customers. Some of these customers are served from a yard maintained for the purpose and some by direct delivery from mine to consumer.

"On the other hand, complainants contend that respondents' operations are those of a *common carrier* by motor vehicle, engaged in the transportation of coal.

"The record indicates that the coal purchased by re-

spondents is ordinarily sold without any unloading or further handling before delivery to the consumer ......
The sale price of coal sold on direct delivery is higher than that paid for it by the respondents, and *complainants contend* that this differential represents a charge for transportation."

We have reviewed the evidence in the record and are of opinion that it does not support the finding of the commission, "that the primary activity of respondents with regard to coal handled by them is the transportation of that coal"; nor sustain the finding, "that the difference between the purchase price paid the producer, and the sale price to the consumer, represents an actual payment to respondents *for transportation*, and respondents' operations are, therefore, in fact those of a carrier." The uncontradicted evidence is directly to the contrary. The difference between the purchase price paid the producer and the sale price to the consumer, gives appellants a profit out of which they pay their expenses of operation, including transportation, leaving a net profit over and above expenses.

On the other hand the uncontradicted evidence fully sustains the following statements of fact appearing in the appellants' history of the case:

"In 1938 the appellants formed a partnership for the purpose of engaging in the business of buying and selling coal. (Record page 35a) A place of business was then established at Shippenville, Clarion County, Pennsylvania, where they had an office, scales, coal yard and trucks. (Record page 34a) They advertised as being in the coal business, kept books and maintained a bank account. (Record page 36a).

"They filed partnership income tax returns in their coal business, and at all times took out and operated under a mercantile coal dealer's license. (Record page 36a).

"They bought coal from various mines in Clarion

County and sold the same to approximately fifty cus-
tomers. (Record page 37a) They never held them-
selves out as carriers. They never hauled coal for
others. (Record page 37a) They never contracted with
anyone to haul coal. (Record page 31a).

"They had invested in their coal business, including
coal yard, office, scales and [four] trucks, about $15,000.
(Record page 36a).

"They used their trucks [only] to deliver their coal
to their buyers. The coal was sold for more than they
paid for it, and the difference represented the cost of
transportation and a profit. (Record page 42a).

"The coal sold to The Pennzoil Company was usu-
ally obtained at the mine and taken by truck to the
Pennzoil plant. Sometimes the coal was obtained from
the yard. (Record page 30a). Sometimes the trucks
with the coal were stored over night in the garage at
the coal yard. (Record page 33a)."

And it justified the following summary taken from
the appellants' argument: "The clear weight of the
testimony in this case, without contradiction, showed
that these appellants were engaged in the business of
buying and selling coal since 1938. They selected their
own source of supply. They made their own pur-
chases of coal, paid for it and found their customers.
They advertised as coal dealers, had their own office,
their own coal yard, weighing scales, and kept books
showing the transactions in their coal business ......
They never hauled or contracted to haul goods for any
other person. The coal that they hauled and delivered
in their own trucks was their own coal which they had
purchased and paid for, and in turn sold to their trade."

Sections 201(b) and 202(c) of the Pennsylvania
Public Utility Law of May 28, 1937, P. L. 1052, which
the complainants charge were violated by the appel-
lants, relate respectively to the necessity of obtaining
a certificate of public convenience from the commission

evidencing its approval, (1) before a public utility shall begin to offer, render, furnish or supply service within this Commonwealth; and (2) for any public utility to begin the exercise of any additional right, power, franchise or privilege. A common carrier of property is a public utility (sec. 2, (17) (c) ). A contract carrier is not. Section 804 relates to contract carriers and makes it unlawful for any person or corporation to engage in the business of, *or render service as,*[1] a contract carrier by motor vehicle unless there is in force, with respect to such carrier, a permit issued by the commission authorizing such person or corporation to engage in such business.[2]

The term 'common carrier by motor vehicle', as defined in section 2(6) (b), as amended by Act of June 21, 1939, P. L. 636, excepts from its provisions: "(b) transportation of property by the owner to himself, or to purchasers directly from him, in vehicles owned and operated by the owner of such property and not otherwise used in transportation of property for compensation for others." It must also be read in connection with the provision in section 2(17), "The term, 'public utility' shall not include (a) any person or corporation, not otherwise a public utility, who or which furnishes service only to himself or itself."

The term 'contract carrier by motor vehicle' as defined in the Act (sec. 2(7) ) : "means any person or corporation who or which provides or furnishes transportation of passengers or property, or both, or any class of passengers or property, between points within this Commonwealth by motor vehicle for compensation, whether or not the owner or operator of such motor vehicle, or who or which provides or furnishes, with or without drivers, any motor vehicle for such transpor-

---

[1] As amended by Act of July 3, 1941, P. L. 267.

[2] We do not refer to the 'Grandfather Clause', for it has no application here.

tation, or for use in such transportation, other than as a common carrier by motor vehicle." [3]

We see nothing in this definition which would include any transportation of property by the owner to himself or to purchasers directly from him, in vehicles owned and operated by him and not otherwise used in the transportation of property for others, for compensation. The law does not contemplate one's making a contract with himself: *Weisberger v. Penna. Public Utility Comm.*, 137 Pa. Superior Ct. 17, 23, 7 A. 2d 731.

There is nothing in the record to justify the slurring statement in the commission's order that the essence of the question here presented is, "whether any trucker may, by equipping himself with a mercantile license and by dumping a few tons of coal on a vacant lot or in his back yard, which he thereafter calls a 'coal yard', set himself up as a bona fide coal dealer and thereby evade the regulatory jurisdiction of the Public Service Commission." When the record shows facts justifying such a statement, the commission can properly deal with such a subterfuge. But counsel for the intervening appellees, who instituted the complaint and are the parties allegedly chiefly interested, on the oral argument very frankly and very properly disclaimed any intention of charging that appellants were practicing any subterfuge.

There is still less warrant in the record for the statement in the brief of counsel for the commission, supplementing the brief of the intervening appellees, that "The importance of the issue involved in this proceeding can best be emphasized by recalling to your Honorable Court that out of arrangements and business practices similar to those of appellant, has grown an enormous illicit industry, namely, coal bootlegging"; following which a paragraph is devoted to a recital of

---

[3] We have not cited the exceptions, which are not applicable here.

alleged similarities—wholly unjustified as respects these appellants—between appellants' operations and bootleg coal operations. Had this statement been called to our attention before the argument, we would, on motion, have ordered it deleted as 'scandalous and impertinent'. Bootleg coal is *stolen* coal, mined on land not owned or leased by those mining it, and for which no royalty is paid the owner. The mining laws enacted for the safety of miners are not observed in such operations. Nor are workmen's compensation laws requiring the insuring of employees obeyed. Short weight is frequently given the consumer by the trucker who assists in this illegal operation.

These appellants *buy* their coal from a mine, which owns the coal, or produces it under a royalty lease, and which must comply with the mining laws and the workmen's compensation laws of the Commonwealth. They sell the coal to their customers, and, just as ninety-nine per cent of coal dealers do, they deliver the coal as a part of the sale. If their customers do not pay them, they must stand the loss. If they do not pay the producer, the latter has no recourse over against the purchasers from appellants. He *sold* the coal to appellants, not to the appellants' customers.

If there had appeared in the record any hint or suspicion of collusion between the producer and these appellants, or between the appellants and their customers, that would support a finding that the respective sales were not bona fide, but were merely a cloak to hide a transportation arrangement contrived to get around the Public Utility Law, we would have no hesitancy in sustaining the commission's order, but there is no evidence justifying any such hint or suspicion. The evidence establishes that the appellants in delivering coal to the Pennzoil Company and its other customers are merely transporting their own property to customers who have purchased it directly from them, in vehicles owned and operated by them, as the owners of the coal,

and not otherwise used in the transportation of property for compensation for others; and that they are neither common carriers by motor vehicle nor contract carriers by motor vehicle, within the intendment of the Public Utility Law.

The fact that the appellants, in some or many instances, may be able to transport coal, which they have bought, direct from the mine to their customers, does not alter the nature of the transaction. It is still the delivery of their own property, bought by them from the mine and sold by them to their customer. In this way they save the expense of a double handling and hauling—first from the mine to their coal yard and then from their coal yard to their customer; but the elimination of the extra haul, when possible, does not affect the nature of the transaction.

As the appellants are not engaged in interstate commerce, we are not much concerned with, nor are we governed by decisions construing the Interstate Commerce Act (Part I of the Interstate Commerce Act— 49 U. S. Code, secs. 1 to 27), or the Motor Carrier Act (Part II of the Interstate Commerce Act—49 U. S. Code, secs. 301 to 327); though we may add that whatever likeness the operations of appellants may bear to cases within the Motor Carrier Act—barring the fact that their operations are wholly intrastate—they are more in the nature of a "private carrier of property by motor vehicle", than either a "common carrier by motor vehicle" or "contract carrier by motor vehicle". By that Act (sec. 303(a) (17) ), the term "private carrier by motor vehicle" is declared to mean "Any person not included in the terms 'common carrier by motor vehicle' or 'contract carrier by motor vehicle', who or which transports in interstate or foreign commerce by motor vehicle property of which such person is the owner, lessee or bailee, when such transportation is for the purpose of sale, lease, or bailment or in furtherance of any commercial enterprise". 'Private carriers by motor

vehicle' are not subject to the regulation of the Interstate Commerce Commission, while common and contract carriers are.

We may state, however, that counsel for intervening appellees have misapprehended and misconstrued the decision in *New York, New Haven and Hartford Railroad Co. v. Interstate Commerce Commission,* and *Interstate Commerce Commission v. Chesapeake & Ohio Railway Co.,* 200 U. S. 361, relied upon by them. In that case the Chesapeake & Ohio Railway Company contracted to sell New York, New Haven & Hartford Railroad Company Kanawha district coal for the price of $2.75 a ton delivered at New Haven, via Newport News, although the price of coal at the mine was $2.47; so that the Chesapeake & Ohio Railway Company got only twenty-eight cents per ton for the transportation, for which the published tariff charges were $1.45 per ton—equivalent to a drawback or rebate from the established freight charge of $1.27 a ton, and constituting an unlawful discrimination. The decision was that the Chesapeake & Ohio Railway Company could not legally contract to sell and transport coal for a stipulated price, which was less than the cost of purchase, the cost of delivery, and the published freight rates. The effect of the contract, if sustained, would have been to permit a gross discrimination in favor of the New York, New Haven & Hartford Railroad Company from the Chesapeake & Ohio Railway Company's published tariff freight charges.

The present case is more nearly similar in its facts to our case of *Weisberger v. Penna. Public Utility Comm.,* 137 Pa. Superior Ct. 17, 7 A. 2d 731, where, reversing the order of the Public Utility Commission, we held that the owners of a dairy who haul to the dairy only milk *purchased by them from farmers, who sold it to the dairy,* and charge back to the farmer, the cost of hauling the milk, so that the *price of the milk delivered to the dairy* conforms with the regulations of

364

the Milk Control Board, are not *common carriers,* within the meaning of the Public Utility Law. And we might add that they are not contract carriers either, since they haul only their own milk, and we said in the opinion: "Manifestly the purchaser could not enter into a contract with himself for the purpose of hauling milk" (p. 23). See also, *Dairymen's Co-op. Sales Assn. v. Public Service Comm.,* 115 Pa. Superior Ct. 100, 174 A. 826, where we reversed similar orders of the commission.

The fourth, fifth, sixth, seventh and ninth assignments of error are sustained. The order is reversed and it is ordered that the complaint be dismissed at the costs of the intervening appellees.