Kimble, Appellant, *v.* Wilson et al.

Argued April 10, 1945.  Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*Sabato M. Bendiner,* with him *S. Regen Ginsburg,* for appellant.

*Joseph W. Henderson,* with him *George M. Brodhead, Jr.,* and *Rawle & Henderson,* for Regan and Swartley, appellees.

*Todd Daniel,* for Gaynor, appellee.

OPINION BY MR. JUSTICE LINN, May 21, 1945:

Miss Kimble, who was very seriously injured in a motor vehicle collision, brought suit and now complains of the refusal to take off nonsuits entered in favor of three of the defendants.

A nonsuit may be entered only in a clear case. If there is doubt of the inferences that may be drawn from the oral evidence, it must be submitted to the jury. In passing on a motion to nonsuit and in reviewing the refusal to take off a nonsuit, the oral evidence must be regarded in the light most favorable to the plaintiff, who must receive the benefit of every fact the jury might reasonably infer in plaintiff's favor from the evidence received or erroneously excluded: *Metzgar v. Lycoming Twp.,* 39 Pa. Superior Ct. 602; *Malone v. Marano,* 326 Pa. 316, 192 A. 254; *Stinson v. Smith,* 329 Pa. 177, 196

A. 843. The facts we shall state are, therefore, such as the jury might have found.

John J. Regan and Wilmer C. Swartley constituted a partnership, trading as Philadelphia Steel and Iron Company, and will be referred to as Steel Company. Their plant is at Conshohocken, Pennsylvania, where they employ over 200 employees. On January 22, 1942, they had a lot of long steel bars for delivery to Baldt Anchor Chain & Forge Company at Chester, Pennsylvania; their own trucks were too short to haul them. An employee named Carr, in charge of shipping, directed James Gaynor, a laborer in the yard, to obtain a tractor trailer in which the shipment might be delivered. Gaynor testified: "A. Well, I was out in the yard and Ed Carr came out to me and he said, Jim, he said, there is a load to go to Chester, ten ton. He said, See if you can get hold of a trailer to haul it. So me and him goes into the office, in the shipping office, and we picks up the phone, and we looked Rooney's number up in the book, and I calls up Rooney, and Joe Rooney answered the telephone. So I said to Joe, I said, Joe, I said, this is Jimmy Gaynor calling. I said, We got a load up here to go to Chester. I said, Can you handle it? And he said, Yes, I guess so. So I said, Well, what is the rate? He said, Oh, he said, twelve cents a hundred. So I turned to Ed Carr, and Ed Carr says, All right. Q. What did you say to Mr. Carr? A. I told Ed Carr twelve cents a hundred. So he said, Send the truck on up. So the truck, he sent the truck up, and I don't remember when the truck got there, what time the truck got there." He was also asked: "Q. Were you in control of this load at the time it was placed on Rooney's truck in the yard of the Philadelphia Steel Company? A. Was I in control of it? Q. Yes. A. Well, I placed the order with Rooney— Q. Yes? A.—to haul this load. Q. Yes? . . . Q. I asked you if you were in control of that load when it was placed on Rooney's truck in the yard. A. Well, I guess I was.

Q. You were in control of it? Was Rooney in control of it? A. Well, Rooney—the way I figure, Rooney was in control of that load to take the load, to haul it. Q. And you were in control of it too? A. That's right."

Joseph Rooney is said to have conducted a coal business; he was sued as Joseph Rooney, individually and trading as "Rooney Truck Rental Service"; his tractor bore the advertisement, "Rooney's Tractor Rental." He sent his tractor-trailer, driven [1] by Joseph Wilson, to the Steel Company. On its arrival, Gaynor [2] directed Wilson where to place it for loading. It was loaded by the Steel Company, who then, acting by Gaynor, instructed Wilson to take the shipment to a customer at 6th & Butler Streets, in Chester, to whom Wilson had made a prior delivery for the Steel Company. Gaynor gave Wilson a delivery slip containing the following:

"Conshohocken, Pa. 1/22/42

DELIVERED BY

PHILADELPHIA STEEL & IRON CO.

To   Baldt Anchor Chain & Forge Co.

Address   Chester, Pa.

Via         6 & Butler Sts.

Your Order      26142      Our Order————

ARTICLES      WEIGHT

23 pcs.   4″ Round Soft Steel Bars  20850#″

While on the way to Chester, at the intersection of Sproul Road and State Road, the trailer collided with a car driven by Louise Beck in which the plaintiff was a passenger. There is evidence that Wilson and Miss Beck were negligent. Gaynor went to the scene of the accident, took charge of the shipment, discharged Rooney

---

[1] Rooney testified: "Q. Did he [Gaynor] ask that a driver be sent with the truck? A. Well, that is the only way I let the truck out, with a driver." ·

[2] While there is evidence to support the fact stated, Gaynor testified that he did not recall whether he was present when Wilson came to the yard or whether he assisted in loading.

and Wilson from further responsibility, employed another truck and driver to deliver it and assisted in transferring the load from one trailer to the other.

Plaintiff sued five defendants: (1) Joseph Wilson, the driver, (2) Rooney, (3) James Gaynor, an employee of Steel Company, part of whose testimony was quoted above, (4) and (5) Messrs. Regan and Swartley, trading as the Steel Company. On the petition of Wilson, Louise Beck, the driver of the car in which plaintiff was riding, was brought in as additional defendant.

Appellant's basic contention is that the Steel Company, acting by its two employees, Carr, in charge of shipping, and Gaynor, a yard laborer, rented a truck and driver from Rooney to make the delivery and that, while so engaged, the truck was the Steel Company's and, temporarily, the Steel Company became the employer of Wilson and Rooney; in other words, that the rule respondeat superior applied. She also contends that the oral evidence supports her contention and should have been submitted to the jury as against the appellee defendants. The case was submitted to the jury only against the defendants Wilson, Rooney, and Louise Beck; the verdict against them was for $30,000.

The Steel Company contends, as we understand the contention, that it made an independent contract with Gaynor by which he undertook the transportation to Chester, and that Gaynor then made an independent contract with Rooney;[3] and that the evidence is so clear as to require a nonsuit.

The plaintiff found it necessary to prove part of her case by calling the defendants as for cross-examination.

---

[3] Gaynor was asked in cross-examination: "Q. What agreement was there with the Philadelphia Steel & Iron Company as to the rate to be charged by Rooney? A. Well, Rooney was going to charge me 12 cents a hundred and I in turn charged Philadelphia Steel & Iron Company. In other words, I don't have any tractor and trailer and I replaced the order with Rooney to haul this load."

Agency or the relation of master and servant and the scope of authority or employment may be shown by the testimony of the agent himself: *Isaac et al. v. D. & C. Mut. F. Ins. Co.*, 301 Pa. 351, 354, 152 A. 95; *Stern v. Dekelbaum*, 153 Pa. Superior Ct. 452, 34 A. 2d 272. The circumstances in which the service is rendered are relevant and may be shown: compare *Davis v. Tredwell*, 347 Pa. 341, 32 A. 2d 411; *Sinclair v. Perma-Maid Co., Inc.*, 345 Pa. 280, 26 A. 2d 924; *Joseph v. United Workers Ass'n.*, 343 Pa. 636, 23 A. 2d 470; *Dunmire v. Fitzgerald*, 349 Pa. 511; *Restatement, Agency*, section 220.

The evidence that is now before us will not support a finding that the defendant, Gaynor, was an independent contractor to transport this shipment. He was employed in the Steel Company's yard as a laborer; he testified: "I do anything in general." His wages as laborer were at the rate of 90 cents an hour. Apart from his work as laborer, he conducted a trucking business [4] with two small trucks and drivers employed by him. He was authorized by the Public Utility Commission to haul the Steel Company's products, as a Class D carrier, from Philadelphia to Bath in Northampton County. In addition, he had a Class B certificate allowing him to transport rubbish, building materials, etc., in dump trucks between points in the City of Philadelphia and within five miles of the City Hall. His employment by the Steel Company in his trucking business, was based, as he said, on "just a verbal contract. They gave me the things to haul and it was to be hauled out of there." He testified that his certificate did not authorize him "to go to Chester." He therefore knew that, without violating the Public Utility Law, he could not make an independent contract with the Steel Company to carry the shipment to Chester. Such an arrangement would not only sub-

---

[4] It was shown by his income tax report for 1942 that his trucking business netted him $18.67 for that year.

ject him to the criminal provisions [5] of the Act, but could not result in a contract: compare *Penna. R. R. v. Cameron,* 280 Pa. 458, 124 A. 638. Presumably his employer, the Steel Company, knew that his license to carry its products, as a Class D carrier, was limited to transportation to Bath, and therefore the Steel Company did not intend to violate the Public Utility Law by attempting to contract with him to haul to Chester. In complying with the request of his superior, Carr, to order a trailer, Gaynor necessarily acted as the servant of the Steel Company; this must be so because his recognized lack of authority to transport to Chester made it impossible for him legally to become an independent contractor for such transportation and at the same time to make another independent contract with another carrier for the same transportation. He was not acting as a broker. If specified conduct, in one view, may be construed to be lawful, and in another, to be unlawful, the lawful construction shall be adopted: *Rau v. Wilkes-Barre & E. R. R. Co.,* 311 Pa. 510, 513, 167 A. 230; *Morgan v. Heinel Motors, Inc.,* 329 Pa. 360, 364, 197 A. 920.

Having shown that Gaynor's inability lawfully to become an independent contractor with respect to this shipment would justify the jury in finding that Carr and Gaynor did not intend that Gaynor should be anything more than the Steel Company's servant, we come to Rooney's status. The thing to be accomplished by the Steel Company was the delivery of the steel to its customer in Chester. If its servant was negligent and the negligence was the legal cause of plaintiff's injury, the Steel Company is liable. Deliveries by the Steel Company were in the regular course of its business and, for that purpose, it maintained two trucks in constant use.

---

[5] Compare *Kneezle v. Scott County Milling Co.* (Missouri), 113 S. W. 2d 817.

Gaynor occasionally drove one of them. It happened that its trucks were not long enough to hold this shipment, making it necessary to hire a truck of greater capacity. In plaintiff's statement of claim it was alleged that Gaynor ". . . engaged the Defendant Joseph Rooney to furnish an adequate vehicle, with licensed driver, for the purpose of hauling the said steel products . . ." etc. In paragraphs 3, 5, 6, 7 and 23-24 of his affidavit of defense, Rooney denied the engagement and averred (we quote only from paragraph 3) that he ". . . rented out to the defendant James Gaynor the motor vehicle involved in the accident, together with the driver . . ." and that the driver, Wilson, was ". . . under the instructions, orders and supervision of the defendant James Gaynor in the hauling of the steel products . . . ;" that ". . . Wilson was acting as an employee of James Gaynor at the time . . ."

At the trial, Rooney, called as for cross-examination, denied that he made those "statements," though admitting that he made the affidavit of defense. Notwithstanding his averments to the contrary, he testified that Wilson was his, Rooney's, employee.[6]

The purpose of an affidavit of defense, as the Practice Act provides, is to aid in forming issues for trial. In consequence of the issue formed by the plaintiff's statement and his affidavit of defense, Rooney, without amending, would not be permitted to deny his averment that the driver, Wilson, ". . . was under the instructions, orders and supervision of the defendant James Gaynor . . ." and the averment that ". . . Wilson was acting as an employee of James Gaynor at the time of the occurrences . . ." It was not necessary, during his examination, to offer in evidence averments in his affidavit of defense, because the pleadings made the issue

---

[6] Rooney, of course, was Wilson's general employer but the important point was whether Wilson was also the special employee of the Steel Company for the time being.

and he would not be permitted to contradict his pleading. Apparently realizing this, Rooney's counsel then asked leave to amend his affidavit to read: "It is admitted that at the time of the occurrences alleged in plaintiff's statement of claim the said driver Joseph Wilson was an agent, servant or employe of defendant Joseph Rooney and was subject to the control, orders and supervision of defendant Joseph Rooney." The amendment was allowed over plaintiff's objection.

The amendment was a direct contradiction of the allegations contained in the paragraph referred to above and in part changed the issue. We are, however, not prepared to say that there was abuse of discretion in allowing the amendment. But it did not put the averments out of the case for all purposes. Rooney's original averments still remained as averments of fact made in the case; he was a party to the suit; the jury was not required to credit his oral testimony contradicting his original averments. The same thing is true of the averments in Wilson's affidavit of defense, which were to the same effect as Rooney's, and which were similarly amended. In *Kreiter v. Bomberger,* 82 Pa. 59, at p. 61, Mr. Justice SHARSWOOD said: "It is clear that though a party has been examined in his own behalf as a witness, his admissions out of court, though contradicting his evidence, are admissible without having first called his attention to them, as is necessary in the case of other witnesses. Such admissions constitute independent evidence of themselves, and are not admissible merely for the purpose of impeaching the credibility of the party as a witness, although incidentally they may also have that effect." If a party's admissions out of court have that effect, certainly a fact pleaded under oath, even though the pleading be subsequently amended, must have the same effect: see, also, *Brubaker's, Adm'r., v. Taylor,* 76 Pa. 83, 87; *Cronkrite v. Trexler,* 187 Pa. 100, 107, 41 A. 22; *Amer. Bank v. Felder,* 59 Pa. Superior Ct.

166, 171; 4 Wigmore, Evidence (3d Ed. 1940) section 1064. Compare *Brehm v. Wyoming Bank & Tr. Co.,* 351 Pa. 281, 40 A. 2d 464; *Hess v. Vinton Colliery Co.,* 255 Pa. 78, 99 A. 281; *Rosenfeld v. Kline,* 125 Pa. Superior Ct. 82.

From the evidence to which we refer in this opinion, the jury would have been justified in finding that Rooney rented his tractor-trailer and his driver to the Steel Company to be used as if owned by the Steel Company. Rooney testified: "Q. Did he [Gaynor] ask that a driver be sent with the truck? A. Well, that is the only way I *let* [7] the truck *out,* with a driver." He had no authority from the Commission to be a contract carrier by motor vehicle, a fact for consideration in determining his relation to the transaction. A contract carrier by motor vehicle is defined in section 2 (7), Act of May 28, 1937, P. L. 1053, Article I, 66 PS section 1102 (7), as amended, as ". . . any person . . . who . . . provides or furnishes . . . with or without drivers, any motor vehicle for such transportation . . ."; see, also, Section 804 of the same Act, 66 PS section 1304, as amended; *Allaman v. Pa. P. U. C.,* 149 Pa. Superior Ct. 353, 359, 27 A. 2d 516. Rooney did not intend to become an independent contractor to transport the Steel Company's property; he testified that when he rented trucks, he "operated under the rights of other haulers," [8] by which the jury may understand that he meant that he let his truck for use by parties having authority to use them and whose employee the driver became for the time being. The Public Utility Law provides that a party transporting his own property does not require a certificate or permit.

---

[7] Italics supplied. Whether Rooney knew it or not, the technical meaning of "let the truck" is inconsistent with the assumption by him of the relation of independent contractor.

[8] He was asked: "Q. Do I understand when you had your trucks and you used them for other than your own business, that was on the rights of some other party acting as a carrier? A. That is right. Q. Not on your own? A. That is right."

"The term 'Public Utility' shall not include (a) any person . . . not otherwise a public utility, who . . . furnishes service only to himself . . ." Article I, section 2 (17), Act of 1937, P. L. 1053, 66 PS section 1102 (17). See also *Allaman v. Pa. P. U. C.*, 149 Pa. Superior Ct. 353, 359, 27 A. 2d 516. The Steel Company therefore could lawfully borrow a truck and with it lawfully haul their own property; the Steel Company had used Rooney's truck once before in delivering to its Chester customer. Rooney was Wilson's general employer but when he ". . . *let* the truck out, with a driver," the lessee or bailee became the driver's special employer for the transaction, the relation of master and servant being thereby established. The rule referred to earlier in this opinion preferring a lawful to an unlawful interpretation of conduct is also applicable to Rooney's relation to the transaction. In some circumstances both renter and borrower may be liable: compare *Gordon v. Byers Motor Car Co.*, 309 Pa. 453, 164 A. 334; a servant may have two masters: *Koontz v. Messer*, 320 Pa. 487, 492, 181 A. 792.

The evidence requires us to reject appellee's contention that neither the Steel Company nor its servant, Gaynor, exercised any control over the transportation beyond specifying the consignee's address. Moreover, the question is not the extent of the control exercised but the power of the Steel Company to exercise control. The evidence to which we have referred was for the consideration of the jury: *Sinclair v. Perma-Maid Co., Inc.*, 345 Pa. 280, 26 A. 2d 924; *Davis v. Tredwell*, 347 Pa. 341, 32 A. 2d 411. In *Dunmire v. Fitzgerald*, 349 Pa. 511, 37 A. 2d 596, Mr. Justice STERN said recently: "Where, as here, it is not entirely clear who was the controlling master of the borrowed employe, and different inferences in that regard can fairly be drawn from the evidence, it is for the jury, not the court, to determine the question of agency: *Lang v. Hanlon*, 302 Pa. 173, 178, 153 A. 143, 145; *Rosen v. Deisinger*, 306 Pa. 13, 16, 158

A. 561; *Dougherty v. Proctor & Schwartz, Inc.,* 317 Pa. 363, 365, 176 A. 439, 440; *Walters v. Kaufmann Department Stores, Inc.,* 334 Pa. 233, 237, 238, 5 A. 2d 559, 561; *Joseph v. United Workers Association,* 343 Pa. 636, 639, 23 A. 2d 470, 472, 473. The test is always whether, in the particular service for which the employe was borrowed, he continued liable to the direction and control of his general employer or became subject to that of the party to whom he was lent or hired, not merely with regard to the result of the work but as to the way in which it should be performed. The criterion is not whether the borrowing employer *in fact* exercised control, but whether he had the *right* to exercise it." The thought, so expressed, may be supplemented by quotation from the opinion of the Court of Appeals of Maryland in *Dippel v. Juliano,* 152 Md. 694, 137 A. 514, 516-517: "The only difficulty about the rule, and it is a real difficulty, is to determine what is meant by 'control.' Ordinarily it means the power to govern, dominate, direct, or supervise in some respect the conduct of another, but the difficulty arises in attempting to define the extent or degree of dominion necessary to constitute the 'control' which the borrower must have over a servant loaned to him before he becomes responsible for his acts, as the word is used in cases applying the rule. Evidently full dominion and control is not necessary, for that would imply the right to hire and discharge, and that is nowhere regarded as essential, while the mere right to point out and direct the servant as to the details of the work and the manner of doing it, leaving to the servant or his general employer the right to determine what work he shall do and what means he shall employ to do it, ordinarily is not enough. But where the work to be done is the borrower's work, and a part of his business, and he has the power and authority to direct when and where and how it shall be done, and where the work is not within the scope of the general

employment of the servant, it may fairly be said that so far as that work is concerned he is under the control of the borrower and that the latter will be responsible for his negligent acts. *Standard Oil Co. v. Anderson,* 212 U. S. 218." Appellees refer to *Blakey v. Capanna,* 349 Pa. 144, 36 A. 2d 789; the facts which the jury may find from the equivocal evidence now before us, compared with what appeared in the *Blakey* case, clearly distinguish it as without controlling effect.

We also think justice requires that the case be retried against all the defendants: compare *Biehl v. Rafferty,* 349 Pa. 493, 500, 37 A. 2d 729; *Nebel v. Burelli,* 352 Pa. 70.

Orders reversed and new trial awarded as to all defendants.