**ROSU v. LAW et al.**

**Nos. 10530, 10532.**

United States Court of Appeals Third Circuit.

Argued Dec. 17, 1951.

Decided Feb. 1, 1952.

John J. McDevitt, 3d, Philadelphia, Pa., for Blue Star Foods, Inc.

Howard R. Detweiler, Philadelphia, Pa. (Frank R. Ambler, Philadelphia, Pa., on the brief), for Liberty Motor Freight Lines, Inc.

Henry I. Koplin, Philadelphia, Pa., for John A. Law.

Before McLAUGHLIN, KALODNER and STALEY, Circuit Judges.

McLAUGHLIN, Circuit Judge.

This is a negligence case in which, on January 9, 1950, in the City of Philadelphia, Pennsylvania, a tractor owned and operated by defendant, John Law, struck and killed plaintiff's decedent. Liberty Motor Freight Lines, Inc. and Blue Star Foods, Inc., were made defendants with Law on the theory that he was the agent or servant of either or both at the time of the accident. At the trial, Law admitted his negligence and all parties agreed that plaintiff's damages be fixed at $40,000. The sole trial issue, as stipulated by the parties, was whether Liberty or Blue Star, or both or neither, were liable to the plaintiff. That issue was presented to the jury by the Trial Court and a verdict returned against all three defendants. Liberty appeals from the judgment thereafter entered and from the order denying its motion for a new trial. Blue Star appeals from the order denying its motion for judgment n. o. v.

Blue Star argues that (1) It had no responsibility for Law's negligence and (2) The proofs justified the verdict as against Liberty. The latter urges that there was no liability attaching to it for Law's conduct at the time and place of the accident.

The plaintiff below is a citizen of Pennsylvania. Blue Star is a Nebraska corporation with its place of business at Council Bluffs, Iowa. Liberty is a New York corporation. Law is a citizen of Kansas. He was plaintiff's sole witness regarding his relationship with appellants. He was not present as a witness at the trial, his testimony being given by deposition. He said that on or about December 28, 1949, he, with his tractor, was engaged by Blue Star to take a load of frozen eggs in a Blue Star trailer to Sunbury, Pennsylvania. He was to be compensated for both the outgoing and return trips at eleven cents a mile for the use of his tractor and five cents a mile for driving. In addition, he had an agreement with Blue Star that he would endeavor to obtain a load of merchandise for the trailer's return journey. All compensation for such freight was to go to Blue Star. Law said that there had been similar arrangements between Blue Star and himself on prior occasions.

Law arrived at Sunbury in due course and then went on to New York where he, apparently, also delivered some of the eggs. Unable to secure any freight for the west in New York he went to Philadelphia with that purpose in mind. Through the operator of a Philadelphia truck stop he was put in touch with the Liberty office in that city. That company had a customer, Atlas Powder Co., located at Atlas Point, on the outskirts of Wilmington, Delaware[1] which desired some merchandise taken to Kansas City, Missouri and Law agreed with Liberty to carry it. Law testified that in his telephone talk with Liberty's dispatcher, which occurred the afternoon of January 9, 1950, the dispatcher told him to come up that evening to the Liberty office at H and Jerome Streets, Philadelphia (some three or four miles from the truck stop) and obtain the various necessary papers in connection with the shipment. This was to enable Law to be at the Atlas plant early the next morning before Liberty had " * * * even opened their office". The time element was important because the trip lease signed by Law in Liberty's office the evening of the 9th named January 13th as his arrival date in Kansas City. The distance between Philadelphia and Kansas City was testified to as about 1300 miles and to be a minimum of four days driving time. Law was operating the unit alone as he had coming east. The lease contemplated compliance with I.C.C. regulations which limited the operator's driving time to not over ten hours in twenty-four without taking eight hours rest.[2] The lease, signed by Law the evening of the 9th, and the truck manifest, signed by him at the same time, were both dated January 10th.[3] By that manifest Law acknowledged that he had "Received Freight in good order". The manifest gave his route as from Philadelphia to Kansas City "via Atlas Pt." The lease stated that the trip was from Philadelphia to Kansas City. Law's negotiation of the lease with Liberty was without doubt in accordance with the instructions given him by Blue Star. He had proceeded to the Liberty office in his tractor leaving the Blue Star trailer at the truck stop. After picking up his papers Law started back to the truck stop in his tractor. He intended, he said, to there obtain his trailer and immediately proceed to the Atlas plant so that he would be

1. In cross examination of Law, counsel for Blue Star either incorrectly used "Atlas Paint" instead of the correct "Atlas Point" or was so misunderstood by the stenographer. As a result the transcript of that cross-examination in several instances reads "Atlas Paint" instead of "Atlas Point". This error is repeated in Liberty's cross examination of Law. All such references are of course to Liberty's customer near Wilmington.

2. 49 C.F.R. Section 191.3(b).

3. Shields, operator of the truck stop, a witness for Liberty, stated that it was not unusual for the driver to go to the freight line and "paper out" the night before though the contract is dated the next day.

able to take aboard his cargo early the next morning. It was while driving to the truck stop that his tractor fatally injured plaintiff's decedent.

■ This being a diversity action, Law's status as operator of the tractor is determined by the law of Pennsylvania.

In connection with Law's relationship to Blue Star the evidence is that he had proceeded on the journey east as a driver employee of Blue Star[4] under a written lease and manifest. According to Law, and not denied, his arrangement with Blue Star about securing a return load was oral and in order that the trailer would not come back empty. He said he had been given discretion by Blue Star to obtain a load wherever he could. Blue Star admits that Law was to be paid on the agreed mileage basis for his return west which included the trip from New York to Philadelphia and Law states that Blue Star paid him at that rate for both tractor and driving mileage from the truck stop to the office of Liberty and return to the truck stop. His testimony is uncontradicted that his only purpose in going to Liberty's office was to procure paying return freight for the trailer which, while not stated in so many words by him, was in performance of his obligation to Blue Star. Having arranged for such freight he was actually on his way to pick up the trailer, with the intention of then immediately driving through to the freight's location at Wilmington, when he became involved in the Rosu accident.

■ It seems to us that the evidence outlined was sufficient under Pennsylvania law to give the Trial Court a sound basis for first refusing to direct a verdict in favor of Blue Star and later denying its motion for judgment n. o. v. If that evidence was accepted by the jury the factual situation shown was distinguishable from the independent contractor status. which, it is contended, applied to Law in his relationship to Blue Star at the time of the accident and is outlined in Johnson, Adm'r v. Angretti, 364 Pa. 602, 608–609, 73 A.2d 666 and the Pennsylvania decisions there cited.

Irrespective of Law's connection with Liberty and despite any contradictions, apparent or real, arising therefrom his. private arrangement with Blue Star is quite clear. From Council Bluffs to New York he had driven under a written lease which put the tractor and trailer " * * * solely and exclusively under the direction and control of Lessee". That lease did not include the return trip. It could be inferred that this was because of the contemplated carriage of freight for hire on the return west. The lessee was Blue Star through Blue Diamond Products. No I.C. C. certificate was needed for that transportation as Blue Star was carrying its own merchandise. Law was to receive the same compensation for his return mileage as he had been given for the drive east. In acceding to the request of Blue Star that he endeavor to bring back a paying cargo, he had accepted Blue Star's control over his conduct and actions in that particular. It was in performance of that agreement that he made contact with Liberty not as an independent contractor but as Blue Star's representative. Acting entirely for Blue Star's financial benefit, at least as between themselves, he contracted for the haulage of Atlas merchandise and it was while he was carrying out that contract that the accident happened. Of necessity, since he was its representative on the ground, Blue Star did leave the securing of the freight to Law. Nor did it insist the travel on. a rigidly designated course either out or inbound. But it did expect

---

4. "Blue Diamond Products", not otherwise identified, was the named lessee of the tractor and trailer on the trip from Nebraska to Sunbury but no point is made of this by any of the parties. Blue Star, answering an interrogatory of plaintiff, states that: "Compensation was paid [to Law] in the usual manner and subject to social security taxes and withholding taxes. This defendant carried workman's compensation insurance on Law and public liability and property damage insurance was in force during all operations on behalf of this defendant." Blue Star attached to its answers to interrogatories on behalf of the plaintiff, the written agreement between Law and Blue Diamond Products together with the eastbound manifest signed by Law as driver.

him, as he said, to "* * * run on the best road we can get through on."

The control by Blue Star of Law until he finished his deliveries at New York is conceded. From then on until the accident there is evidence which strongly suggests that Blue Star had the continuing power to control him as far as his association with it and its trailer was concerned. But there is not the slightest inference in the record of any attempt by Blue Star to reach Law on the road at any time and alter its plan for his trip west. Obviously Blue Star was perfectly satisfied with the agreement it had made with Law at Council Bluffs. And everything that Law did, his going to the Liberty office, arranging for the freight and moving promptly to start that freight west so that he could deliver it as called for in the manifest, points not just to Blue Star's power to control him but to a very real control during the critical period here involved.

The Pennsylvania decisions fully support the District Court in allowing that question of Blue Star's responsibility for Law to go to the jury. Kissell v. Motor Age Transit Lines, 357 Pa. 204, 209, 210, 53 A.2d 593; Dunmire v. Fitzgerald, 349 Pa. 511, 516, 37 A.2d 596; Siidekum v. Animal Rescue League, 353 Pa. 408, 414, 45 A.2d 59.

 Even less reason exists for disturbing the judgment against Liberty. In addition to proofs to the effect that Law was acting under Liberty's specific direction when the accident occurred, there is also substantial evidence that he was, at that time, operating his tractor under Liberty's I.C.C. certificate.

Law said that he went to Liberty's office, on the afternoon of January 9th, at the request of that company's dispatcher to obtain the trip papers so that he would be able to make an early start west the next morning. There is some indication from his testimony that the dispatcher intended him to drive to the Liberty office in his tractor, the only motor vehicle he had with him at the truck stop. On direct examination Law was asked, "Did you drive up to Liberty Motor Freight?" He answered, "After they requested me to drive up."

There is no mention in the record of private transportation other than the tractor being available to Law. Knowledge by the dispatcher that Law had his tractor with him when he came to the Liberty office can be inferred from Law's testimony (quoted infra) that under the agreement he had reached with the dispatcher he was to immediately leave the Liberty office "* * * pick up [his] trailer * * *", etc.

The proofs indicate that Liberty wished him to make delivery at Kansas City by January 13th and that such date made time of the essence. Law testified that the Liberty dispatcher gave him a route to travel. Apparently in connection with this he said, "They showed me on the map how to get to Atlas Paint." Under cross examination Law definitely agreed that leaving Liberty's office he was proceeding toward the truck stop to obtain the Blue Star trailer and after fastening this to his tractor he planned to continue at once to the Atlas plant. That particular testimony reads as follows:

"Q. You were to be at Atlas Paint Company early the next morning? A. Before Liberty Freight opened the next morning. He wanted me to get my bills from them at night so I could be there early in the morning.

"Q. You had to leave Philadelphia that night as you could make it? A. Well, yes.

"Q. As I understand it, one of the terms was that you were to immediately leave Liberty Motor Freight with their papers, pick up your trailer so as to be sure to be at the Atlas Paint the next morning; is that right? A. Yes, sir."

It is undisputed that all of Law's negotiations with Liberty had been concluded. He had been furnished with his necessary carriage papers by Liberty including one of its I.C.C. stickers. He had received partial advance payment for the load. The truck manifest named the freight delivery date in Kansas City as January 13th and in order to meet this requirement he needed to start as quickly as possible. According to him, because of the urgency, he had been instructed by Liberty to be at the con-

signor's place of business early the next morning and to comply with those instructions he left the Liberty office expecting to go to Wilmington at once, stopping only to pick up his trailer. He was in the first stage of that trip when the accident happened.

If the jury credited the above evidence Law might be found to have been following Liberty's special orders when his tractor struck the deceased. In those circumstances the control by Liberty of Law indicated by that evidence comes well within the Pennsylvania control test. Cf. Kissell v. Motor Age Transit Lines, supra. Testimony on behalf of Liberty denying Law's story of pressing instructions, at most, produced a credibility question which was for the jury.

The other ground for affirming the judgment against Liberty arises out of the interstate shipment of merchandise from Pennsylvania to Missouri. By its trip lease Liberty was the lessee carrier and Law the lessor owner who agreed to operate the tractor trailer as an independent contractor. The transportation of the merchandise was under the authority of Liberty's I.C.C. certificate. Without that certificate the transportation could not have been legally furnished and therefore Liberty could not validly transfer its responsibility and liability to Law who had no such certificate. In that situation the attempted creation of the role of independent contractor for Law in the lease was of no avail under Pennsylvania law. Kimble v. Wilson, 352 Pa. 275, 281–282, 42 A.2d 526; Pennsylvania R. R. Co. v. Cameron, 280 Pa. 458, 466, 124 A. 638, 33 A.L.R. 1281. And see Venuto v. Robinson, 3 Cir., 118 F.2d 679, 682, certiorari denied C. A. Ross, Agent, Inc., v. Venuto, 314 U.S. 627, 62 S.Ct. 58, 86 L.Ed. 504.

Liberty does not seriously contest the above legal principle but argues that at the time of the accident Law's operation under Liberty's I.C.C. license had not yet commenced. However, the record reveals considerable evidence from which the jury could fairly conclude that he was then driving the tractor under Liberty's I.C.C. authority.

The lease admittedly was subject to I.C.C. regulations. Liberty's dispatcher had given Law one of the company's I.C.C. stickers which denoted his authority to haul the interstate shipment. With his clearance papers he had also received an advance payment check and a Missouri travel order, the latter to take care of road taxes in that state. Law's testimony, as has been stated, is that the dispatcher at that same time directed him " * * * to immediately leave Liberty Freight with their papers, pick up [his] trailer so as to be sure to be at the Atlas Paint the next morning" and that for him to arrive as early as directed he had to leave the night before. The lease and manifest, though dated the following day, had already been executed by him. In the manifest he acknowledged receipt of his cargo which was not in fact to be turned over to him until the next morning. Both the lease and manifest stated that the trip was from Philadelphia to Kansas City. The manifest contained the further descriptive language "by way of Atlas Pt." The lease itself makes it apparent that it was executed at the Liberty terminal, Philadelphia. It was shortly after Law left that terminal to go to the truck stop that the accident occurred.

Though evidence for Liberty strongly disagrees with Law's version of his dealings with that company that, as already pointed out, was strictly a jury problem. From his testimony plus the other evidence above mentioned, the jury could find that, at the time of the accident, Law was operating his tractor under the Liberty I.C.C. certificate.

There are two other points in appellant Liberty's brief. Both these were expressly waived in open court at the oral argument. In any event neither point is properly before us. The first complains generally of the charge. There was no exception taken in connection with the charge by any of the parties. The second derives from a question asked of the Liberty witness, W. C. Ruroede, on cross-examination. There had been no objection to that question when it was asked.

The judgment and orders below will be affirmed.