**PATTON et al.**

v.

**BALTIMORE & O. R. CO. (DUQUESNE SLAG PRODUCTS CO., Third-party Defendant).**

**Civ. A. No. 8634.**

United States District Court
W. D. Pennsylvania.

Dec. 8, 1953.

On Third-party Action March 24, 1954.

Judgment Affirmed June 30, 1954.

See 214 F.2d 129.

James P. McArdle, Pittsburgh, Pa., for plaintiff.

Marvin D. Power, of Margiotti & Casey, Pittsburgh, Pa., for defendant.

Donald M. Bane, of Prichard, Lawler & Geltz, Pittsburgh, Pa., for third-party defendant.

MARSH, District Judge.

This was a wrongful death and survival action brought by Eva Marie Patton as administratrix of the estate of John B. Patton, deceased, and as trustee ad litem for herself and for the five minor Patton children, against the Baltimore and Ohio Railroad Company, a Delaware corporation. The railroad company filed a third-party complaint against the Duquesne Slag Products Company, a Pennsylvania corporation. The plaintiff is a citizen of Pennsylvania and a resident of the City of Pittsburgh, Allegheny County, and the court has jurisdiction by reason of diversity of citizenship and the jurisdictional amount.

On August 5, 1949, John Patton, an employee of the Duquesne Slag Products Company, was engaged in repairing one of a string of freight cars on the slag company's siding. At about 2:00 P. M. on the day in question four gondola cars belonging to the defendant railroad ran away from the place where they were being unloaded by employees of the slag company and collided with the line of cars upon which Patton was working. These cars were moved by the collision and Patton was killed instantly, his body being severed near the waist by a car wheel.

This case came on for trial before our late brother, The Honorable Owen M. Burns, in February of 1951. At that trial verdict and judgment were entered for the plaintiff and against both defendants in the amount of $65,000, D.C., 99 F.Supp. 455. Appeals were taken and the Court of Appeals reversed and ordered a new trial, 3 Cir., 197 F.2d 732. The second trial took place in October of 1952 and resulted in two verdicts in favor of the plaintiff and against the rail-

road, and a verdict in favor of the third-party defendant and against the railroad. Judgment was entered in the wrongful death action in the sum of $113,000, and in the survival action in the sum of $20,000. Two days later, on October 26, 1952, Judge Burns died.

The case is now before this court on application by the Baltimore and Ohio Railroad "To Have Verdict And Judgment Set Aside As To It And To Have Judgment Entered In Accordance With Defendant's Motion For Dismissal And For a Directed Verdict And Motion For New Trial," and "To Have Verdict And Judgment Set Aside In Its Action Against The Third-Party Defendant, Duquesne Slag Products Company, And Motion For New Trial."

Among other reasons in support of the motion for a new trial, counsel for the railroad sets forth the following:

"Inasmuch as the testimony presents many questions of credibility of witnesses, the legality of rulings made upon the admissibility or exclusion of evidence, and many rulings upon the competency of expert witnesses, on account of the death of the Honorable Judge Owen M. Burns on October 26, original defendant asks a new trial under the provisions of Rule 63 of the Federal Rules of Civil Procedure [28 U.S.C.A.]."

Rule 63 provides:

"If by reason of death, sickness, or other disability, a judge before whom an action has been tried is unable to perform the duties to be performed by the court under these rules after a verdict is returned or findings of fact and conclusions of law are filed, then any other judge regularly sitting in or assigned to the court in which the action was tried may perform those duties; but if such other judge is satisfied that he cannot perform those duties because he did not preside at the trial or for any other reason, he may in his discretion grant a new trial."

At oral argument, in answer to a question of this court whether there was any difference between the two trials in respect to the evidence of negligence, counsel for the railroad stated:

"I say in a large measure insofar as plaintiff's case is concerned it was the same. The difference in the testimony was on the part of the defendant; more testimony was produced."

Subsequently, in reply to a statement in plaintiff's brief that the same witnesses were used at both trials and that they testified to exactly the same set of circumstances in each, counsel for the railroad submitted to the court a list from which it appears that there were seven witnesses called by the plaintiff at the second trial who had not testified at the first trial and there were seven witnesses who testified at the first trial who were not called at the second. Consequently, we felt required to make a comparison of the testimony of the two trials. This effort has convinced us that the evidence on the part of the plaintiff in each trial was substantially the same, and for the most part the same witnesses were used in each trial.[1]

---

1. Witnesses who testified for plaintiff at both trials and whose testimony was substantially the same at each were: Myers, Hollen, Harekal, Nicotra, Livingston, Herforth, Mowers, Keady, Connelly, Stewart, Hapchuck, Hennix, Seibels, Lawrence Patton and Bahr. Bowen, an expert on air brakes, testified briefly in rebuttal at the first trial. At the second trial, he testified during plaintiff's case in chief and described in detail the workings of air brakes.

The testimony of Eva M. Patton taken at the first trial was read into evidence at the second by agreement of counsel.

Witnesses who testified for plaintiff at the second trial but not at the first were: Maglioccheti, Jenkins, Crogan and Simon, all of whom were brakemen or conductors of the Monongahela Connecting Railroad and whose testimony as to the condition of the brakes on the Baltimore and Ohio slag cars was cumulative evidence similar to the testimony of six oth-

■ Following the first trial, Judge Burns denied the Baltimore and Ohio's motion for a new trial. This action indicated that he was satisfied with the competency and credibility of the witnesses for the plaintiff. Since we find the evidence in the second trial to be substantially the same, the action of the trial judge weighs heavily against exercising discretion in favor of a new trial merely because Rule 63 permits it. Furthermore, we have the benefit of the opinion of the Court of Appeals in the first case to guide us through the vital problems of liability. A new trial is refused on this ground.

We proceed then to examine the defendant's reasons for judgment n. o. v. and a new trial on their merits.

■■ In passing upon these motions the court must view the evidence in the light most favorable to the plaintiff; also, we have in mind that "courts are not free to re-weigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." Tennant v. Peoria & Pekin Union Ry. Co., 1944, 321 U.S. 29, 64 S.Ct. 409, 412, 88 L.Ed. 520.

At both trials plaintiff's witnesses testified that the brakes on all Baltimore and Ohio gondola cars marked "For Slag Service Only" were inefficient; that this defective condition of the brakes was common knowledge among the train crews of Monongahela Connecting Railroad who handled these cars daily; and that this condition had existed for a considerable period of time prior to the accident.[2] The testimony gave rise to a strong inference that the four runaway cars were part of a pool of B. & O. gondola cars marked "For Slag Service Only" which made round trips between the Monongahela yards and the Duquesne tracks. Other witnesses for plaintiff testified that prior to the accident the brakes were properly set on the four runaway cars [3] and that these brakes were not released either intentionally or accidently in the unloading process.[4]

The jury could properly have found that the railroad breached its "duty of delivering its cars in reasonably safe condition; that the brakes on the four

er Monongahela Connecting Railroad employees who testified at both trials; Edwards, an official of the Monongahela Connecting Railroad who answered a subpoena to produce certain bulletins of that company relative to the use of B. & O. slag cars; Johns, a car clerk of the Monongahela Connecting Railroad, who testified that the B. & O. cars marked "For Slag Service Only" were kept in that service exclusively; Dennis Harrington, a lawyer associated with plaintiff's counsel, who testified that deceased died intestate, and that all bills against the estate had been paid.

Witnesses who testified at the first trial but not at the second were: Christopher J. Harrington, Lester, Mooney, Phillips and Finnegan, all of whom were employees of the Monongahela Connecting Railroad and whose testimony was cumulative of the evidence given by the witnesses above referred to who testified at both trials regarding the efficiency of the brakes on B. & O. slag cars; Dunn, an officer of the Railroad Brotherhood, who produced the minute book of the P. J. Duffy Lodge, No. 553, and testified concerning complaints about the brakes on the B. & O. slag cars; Duesenberry, district manager of the Car Service Division of the Association of American Railroads, who testified as to the regulation that air brakes be cleaned periodically and as to the practice among the various railroads of repairing and servicing each other's cars when necessary; Mary Patton, who testified briefly as to the health and habits of John Patton; Williamson, who testified in rebuttal as to the grade of tracks at the Highland Yard.

Chester H. Mitz, general superintendent of the Duquesne Slag Products Company, testified briefly at the first trial that he arrived at the scene sometime after the accident occurred. He identified the four runaway cars. At the second trial he testified that John Patton had been a competent and efficient worker.

2. R. 167–216.

3. R. 32–35, 219.

4. R. 104, 227, 237, 254, 266, 267.

cars in question were inefficient; and that these defects were a proximate cause of the accident." In addition, the jury could have found, as a concurring proximate cause, that the railroad failed to conduct a "reasonably adequate inspection" and knew, or should have known, of the defective condition of the brakes on its slag cars.

In support of the conclusion that there was sufficient evidence of the railroad's liability reference need only be made to the discussion by the Court of Appeals following the first trial, 197 F.2d 732, at pages 741, 742. What was there said by Chief Judge Biggs in regard to the legal liability of the defendant is equally applicable to the evidence contained in the record of the second trial.

■ The defendant railroad cites as error the ruling of the trial judge in denying its motions for a directed verdict, and for dismissal of the complaint as to the original defendant; these motions were based upon the proposition that there was no proof of negligence or breach of duty under the law of Pennsylvania. After a careful analysis of the testimony and of defendant's argument and the cases cited in support thereof, it is the opinion of this court that there was sufficient evidence from which the jury could find that the defendant railroad was negligent and that its negligence was the proximate cause of the death of John Patton.

■ The railroad devoted fourteen pages of its brief in an effort to persuade this court that the Court of Appeals was in error in finding that there was sufficient evidence in the first trial to support the jury's finding of liability on the part of the railroad, and it urges that the verdict of the jury in the second trial should be set aside and judgment entered for defendant. On the other hand, plaintiff contends that the question is *res judicata* because of the

decision of the Court of Appeals. We do not agree with either proposition. However, in the absence of a material variance in the plaintiff's evidence in the second trial from that in the first, the decision of the Court of Appeals is the strongest possible authority on the issues of liability.

■ The defendant railroad cites as error the admission of evidence based on the condition and use of brakes on slag cars and on other cars in no way connected with this case. With respect to the testimony concerning the brakes on slag cars generally, it is our opinion that the evidence was properly admitted. See 197 F.2d 732.

The defendant railroad also complains about the admission, over objection, of the testimony of two employees of the Jones & Laughlin Steel Company who testified as to the use of a skate on hopper cars being unloaded at the Jones & Laughlin plant [5] and the testimony of a coal unloading foreman of Jones & Laughlin as to the use of a vibrator in unloading coal from hopper cars on a descending grade.[6]

■ The testimony regarding the skate was offered in rebuttal to the testimony of the witness Hodgson, who testified on behalf of the defendant railroad, as to the effectiveness of the skate used by the slag company on the four runaway cars, and, as such, was properly admitted. In fact, counsel for the railroad himself stated that the testimony regarding the use of the skate was proper rebuttal.[7] The testimony regarding the vibrator was admissible to rebut the inference brought out by counsel for the railroad in his cross-examination [8] that the slag company's method of unloading the cars with a clam shell bucket made them vibrate so much that the brakes were released. See Moreau v. Pennsylvania R. Co., 3 Cir., 1948, 166 F.2d 543, 545.

5. R. 664–679.

6. R. 682–691.

7. R. 666.

8. R. pages 43, 44, 102, 103, 142, 229, 231, 237, 239, 253, 254, 261 and 262.

The defendant railroad cites as error the charge of the trial court concerning the duty of the railroad to inspect and furnish reasonably safe cars, and also that part of the charge regarding the duty of the railroad to foresee the possibility that the slag company might not take adequate precautions to prevent the cars from running away. A comparison of these portions of the charge with the opinion of the Court of Appeals, 197 F.2d 732, at pages 741, 742, indicates to this court that the charge follows closely the reasoning there set forth.

The defendant railroad also cites as error the trial court's instruction that the jury could find a verdict for Mrs. Patton as administratrix in the survival action. The defendant contends in this regard that since the evidence in behalf of the plaintiff shows that all of John Patton's income was expended in providing for and maintaining his family and himself, there was no evidence upon which this verdict could be sustained. We think this position is untenable.

It is true that the evidence shows that at the date of his death John Patton was using all of his earnings to support his family and that there was no evidence of accumulations. But the evidence also disclosed that he was a prudent man of frugal habits who made the most of his resources; that he kept a cow, chickens and hogs; and that he had a garden. It is common knowledge that in the early years of a marriage when the children are young, it is difficult for a workingman to accumulate savings. This is especially true in the larger families, such as the Patton family. Nevertheless, it is also common knowledge that as the children grow older they become more independent until, in the normal course of events, the parents are no longer required to provide for their support. Along with the evidence in the case, each juror takes into the jury room his own common sense, and the benefit of his experiences in living as a member of society. It is the opinion of this court that there was sufficient evidence, viewed in the light of the common sense, knowledge and experience of the jury, to sustain a verdict in the survival action.[9]

In pressing its motion for a new trial the defendant contends that the verdicts totalling $133,000 were the result of passion and prejudice on the part of the jury, and that in the interests of justice, a new trial should be granted. The court is unable to find any evidence in the record that the verdicts were the result of passion and prejudice unless we would so conclude from the mere size of the verdicts and, as defendant puts it, from the presence at the trial of decedent's "five beautiful small children." We are of the opinion that these considerations in themselves are not sufficient to hold that the jury was motivated by passion, prejudice or caprice.

It is, of course, impossible to determine precisely what factors influenced the jury in reaching these verdicts, but it is just as likely that they made mistakes in calculation, e. g., by failing to properly reduce the prospective future net earnings of decedent to present worth, as that they were influenced by improper motives.

The defendant, however, insists that the awards of $20,000 and $113,000 are excessive and in this we are in accord. Likewise, we agree with plaintiff that the federal judiciary, having a "strong and stalwart belief in the right of trial by jury * * * does not * * * look with a jaundiced eye upon the plain-

---

9. The case of Vincent v. City of Philadelphia, 1944, 348 Pa. 290, 35 A.2d 65, cited by counsel for the railroad as supporting his contention, seems rather to support the opposite view. In that case, the decedent was a six year old child. It is difficult to imagine evidence of accumulation at this early age. The action was brought by the parents under the wrongful death and survival acts and verdicts were rendered in each case. While the court did reduce the verdict somewhat in the survival action, nevertheless a recovery of $7,000 was allowed.

tiff and his verdict after it has been given the careful and conscientious scrutiny of twelve of plaintiff's peers."

In Armit v. Loveland, 3 Cir., 1940, 115 F.2d 308, 314, Judge Jones, now Mr. Justice Jones of the Pennsylvania Supreme Court, said: "Courts in general are reluctant to disturb a jury's verdict on the ground of excessiveness where the damages are unliquidated and there is no fixed measure of mathematical certainty." See also Jones v. Atlantic Refining Co., D.C.E.D. Pa.1944, 55 F.Supp. 17. But it is also said if excessive verdicts were permitted to stand, the right of trial by jury would be seriously jeopardized, and the power of a trial judge, or as here, one occupying his position, to reduce the verdicts or set them aside is not in derogation of the right of trial by jury, but is one of the historic safeguards of that right. Cf. Aetna Casualty & Surety Co. v. Yeatts, 4 Cir., 1941, 122 F.2d 350, 352; Smith v. Times Publishing Co., 1897, 178 Pa. 481, 36 A. 296, 35 L.R.A. 819.

If plaintiff is entitled to a recovery, it is only for such damages as would reasonably compensate her and her children, and the estate of the decedent, for the pecuniary loss suffered by them as a result of John Patton's death. Any award to the wife and children must be based upon evidence of contributions from the decedent which they could have expected with reasonable certainty.

Examination of the evidence discloses that the decedent was healthy and hardworking. He was employed as a bull-dozer operator. There was testimony that he was an efficient worker. He provided well for his wife and children, contributing to their support most of his income. In the year preceding his death he earned about $4,000. When killed he was 39 years of age.[10]

Successive increases in the rate of bulldozer operators' wages granted between the date of death and the time of trial would have justified a finding of income in excess of $4,500 for the year 1951. In addition, the plaintiff and her children most likely would have received for many years contributions in food of substantial value from the truck garden, cow, hogs and chickens which decedent maintained. For the 28-year period of expectancy from the time of trial, the jury conceivably could have found Patton's gross earnings to be between $126,000 and $155,000, and having a present worth of between $60,000 and $74,000.[11]

To the present worth of prospective earnings could be added wages and food contributions lost from the date of death to the time of trial, which could be estimated at about $12,000. Thus, with funeral expenses,[12] damages between $72,000 and $86,000 could be justified.

It will be noted, of course, that the foregoing calculations do not take into account deductions measured by the amounts which decedent would have necessarily expended for his personal maintenance for the period of his expectancy. Murray v. Philadelphia Transportation Co., 1948, 359 Pa. 69, 58 A.2d 323. On the other hand, in view of Patton's good health, agricul-

---

10. Mortality Tables, 58 C.J.S., page 1212, indicate that decedent's life expectancy at the date of his death was 30.08 years.

11. Courts have used annuity tables as a guide to present worth in determining whether or not a verdict is excessive. See Southern Pac. Co. v. Guthrie, 9 Cir., 1951, 186 F.2d 926; Jones v. Atlantic Refining Co., supra.

In Pennsylvania, the legal rate of interest (6%) is employed when reducing a sum to its present worth. See Mur-

ray v. Philadelphia Transportation Co., 1948, 359 Pa. 69, 58 A.2d 323, citing Windle v. Davis, 1922, 275 Pa. 23, 118 A. 503. This rule has been criticized as unrealistic. See Mr. Justice Stern's dissent in Murray v. Philadelphia Transportation Co., supra, footnote 2, 58 A.2d 328. Although we agree with the views expressed by Justice Stern, we are bound by the opposite rule.

12. The funeral expenses were $566.80.

tural skill, thrifty economic habits, prospects for increases in pay and advancement, and other circumstances, the jury could reasonably have anticipated that his earning capacity would have increased to some extent as time passed, with perhaps some decreases in old age. In these two fields, i. e., costs of maintenance and the stability of prospective earnings, reasonable minds can differ in determining the amounts to be employed respectively in abatement and enhancement of the awards. The evidence in these two respects would give the jury considerable latitude in making their estimates, and mathematical calculations based upon figures conjured up by the court would be of little help.

▮ In the interest of justice, the court does not feel that it is compelled to grant a new trial unconditionally because the verdicts are excessive. Northern Pacific R. Co. v. Herbert, 1886, 116 U.S. 642, 646, 6 S.Ct. 590, 29 L.Ed. 755. However, it is our judgment that, in order to do justice between the parties, the plaintiff should be required to remit, in the death action, all monies awarded under the verdict in excess of $68,566.80, and in the survival action, all monies awarded under the verdict in excess of $9,000. See the opinion of Judge Delehant in Rice v. Union Pacific R. Co., D.C.D.Neb.Omaha Div.1949, 82 F.Supp. 1002, and the cases collected therein. If plaintiff fails to file a stipulation to that effect within twenty days a new trial will be ordered.

### On Third-party Action

In the third-party action tried in the above case, the verdict was in favor of Duquesne Slag Products Company, the third-party defendant. The original defendant, Baltimore and Ohio Railroad Company, moved for a new trial in its action against Duquesne. Eleven reasons were assigned on the 25th of October, 1952, the day following the verdict; a twelfth reason was assigned on the 28th of October, following the death of the trial judge on October 26th; eight reasons were assigned on December 18, 1952; and four reasons were assigned on December 15, 1953. The latter four reasons were the result of this court's request for reargument with particular reference to the instructions which the trial judge gave to the jury.

We have reviewed each of these assignments, although those emphasized by B. & O. were overruled in our opinion filed December 8, 1953, in the contest between the plaintiff and B. & O.

The assignments relating to the weight of the evidence and those relating to the court's instructions were not pressed by B. & O. in its original brief; if it is deemed that they are now given undue prominence by this court on its own motion, the situation may be attributed to the vicarious performance of the duties of the trial judge—a difficult task recognized as such by our superiors in Gordon v. Robinson, 3 Cir., 1954, 210 F.2d 192.

There was considerable evidence that Duquesne Slag was negligent and that its negligence was a contributing cause of Patton's death.[1] Several Duquesne employees[2] knew that the B. & O. slag cars had defective brakes and knew that they had run away on prior occasions. Mr. Mitz, Duquesne's general superintendent, was aware that these cars had defective brakes. Notwithstanding, no extraordinary precautions were taken to protect persons working downgrade of these cars in case they worked loose, viz.: the switch between the cars being repaired downgrade and these four cars being unloaded upgrade was not thrown; this action would have afforded more time to warn repairmen working under or between the cars (T. 623). No derailer was placed to protect the car repairmen downgrade. No danger whistle was provided.

On the other hand, the evidence shows that some additional safety measures

[1]. The verdict at the first trial was against Duquesne.

[2]. Harekal, the brakeman; Hollen, the engineer; Hapchuck, a laborer; Stewart, the crane operator.

were taken to prevent the four cars from moving, viz.: the brakes were first applied by air; 4 x 4 oak blocks were placed under a wheel of every car; a metal skate was placed under the front left wheel of the front car downgrade; the handbrakes on all four cars were tightened as far as they would go by use of a brake club.[3] Mr. Mitz, who was called as a witness by B. & O., testified that good railroad technique was exercised in applying the brakes to this equipment and that he considered the protective measures taken to have been adequate (T. 614).

Despite these extra precautions, the jury could have found Duquesne negligent in the use of cars known by its employees to have brakes that would not hold, Restatement, Torts, § 307, and that the extra safety measures taken were not reasonably cautious in the circumstances. There was evidence that the engineer and brakeman lacked necessary technical knowledge; that they failed to "bleed" off the air in the brakes to attain proper tension; that they failed to affix the skate in the safest manner under the car wheel.

Also, as in accidents caused by unattended motor vehicles, the jury could properly have inferred negligence, because in the ordinary course of things such accidents do not happen if the person in control of the car uses proper care; see Endler v. United States, D.C. M.D.Pa.1951, 101 F.Supp. 332, for an example.

Upon these considerations it seemed that a new trial should be granted because the verdict was against the weight of the evidence. In opposition thereto is the consideration that B. & O., in addition to the aforementioned testimony of Superintendent Mitz, urged the admission in evidence, strangely enough over the objections of Duquesne,[4] of Exhibit "S", which detailed the extra safety measures taken by the Duquesne employees, presumably because of their prior knowledge of the defective brakes, and containing his ultimate conclusion that "I can find no evidence in this accident as far as I have investigated of any negligence or carelessness" on the part of Duquesne Slag or its employees (T. 626). By this testimony it seems irrefutable that B. & O. extended an invitation to the jury to exonerate Duquesne and accordingly, with some misgivings, we have determined not to disturb their acceptance.

A study of the instructions of the court in the light of the rather strong evidence of negligence on the part of Duquesne, leads us to the opinion that the jury was confused on how to assess responsibility against Duquesne. We observe that the trial judge told the jury (T. 707) that they were to decide whether or not Duquesne was legally "responsible," but when the jury asked the following question: "Can responsibility in this case be assessed on both B. & O. and Duquesne Slag Products Co.?" (T. 712) the court responded in writing: "In answer to Question No. 1, the answer is 'No. Your verdict can be as follows, if you have so decided: 1. We, the jury, find in favor of the plaintiff and against the B. & O. Railroad in certain amounts,' blank, blank." (T. 713.)

Further, no explanation was offered the jury concerning the legal effect of contribution, or why they could not return a verdict against Duquesne in a certain amount of money if they found Duquesne responsible.

3. A short time after the accident the handbrakes on two of the cars were found in a released position, and one of them had been transferred from the normal vertical to a horizontal position beneath the floor of the car; the metal skate was found under the wheel of the front runaway car after the collision. The brakes might have been released by the impact and other interference subsequent to the runaway. See Exhibit "S".

4. See testimony, pages 597–603. It is doubtful if the exhibit should have been admitted in view of the ruling in Palmer v. Hoffman, 1943, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645; cf. Gordon v. Robinson, supra.

The jury's second question to the court was: [If B. & O. and Duquesne were both responsible] "can jury determine percentage of award against each?" to which the court responded: "You cannot determine the percentage. The percentage is no concern of yours. Consult B on the guide[5] handed you with your verdict form. It will answer your questions. Do not concern yourself with percentages [T. 713]." We do not think that the guide adequately answered the questions which the situation relative to damages evidently had created in the minds of the jury.

But no objections were made by B. & O. under Rule 46, F.R.C.P., at the time the written answers were prepared and sent to the jury. Indeed the answers seemed to have been prepared with the cooperation and assent of the counsel for all parties (T. 713). Moreover, no specific objections were made to the charge on any of the various phases connected with the third-party issue. This is a fatal omission under Rule 51, F.R.C.P.; McDonald v. Pennsylvania R. Co., 3 Cir., 1954, 210 F.2d 524; Kieffer v. Blue Seal Chemical Co., 3 Cir., 1952, 196 F.2d 614, 616; Biggans v. Hajoca Corp., 3 Cir., 1950, 185 F.2d 982, 986, especially when it does not appear that fundamental error which might obviate objections is involved, and we do not detect any such fundamental error in the charge as a whole.

As heretofore stated, B. & O. in its reasons for new trial did not charge error in the above mentioned particulars until after the court on its own motion ordered further argument with particular reference to the instructions. After considerable delay for various causes, including illness of Duquesne's counsel, we now have his brief and it is convincing that this court is prohibited from granting a new trial on its own initiative for reasons assigned over one year after the entry of judgment. Rule 59(b), F.R.C.P., provides:

"(b) Time for Motion. A motion for a new trial shall be served not later than 10 days after the entry of the judgment."

Rule 59(d), F.R.C.P., provides:

"(d) On Initiative of Court. Not later than 10 days after entry of judgment the court of its own initiative may order a new trial for any reason for which it might have granted a new trial on motion of a party, and in the order shall specify the grounds therefor."

Rule 6(b), F.R.C.P., specifically provides that the court may not extend the time for taking any action under Rules 59(b) and 59(d). See McHugh v. Audet, D.C.M.D.Pa.1947, 72 F.Supp. 394, 403.

Consideration has been given to that part of Rule 63 which provides that if a substitute judge "is satisfied that he cannot perform those duties [of the trial judge] because he did not preside at the trial *or for any other reason,* he may in his discretion grant a new trial [emphasis added]." It is our opinion that the emphasized phrase does not include those reasons for a new trial which might occur to the mind of a substitute judge many months after the case was tried.

An order refusing a new trial in the third-party action will be entered.

---

5. B on the guide is as follows:
   "B 'We, the jurors empaneled in the above entitled case, find, as to the complaint filed by Mrs. Patton against the Baltimore and Ohio Railroad Company, in favor of Mrs. Patton, as Administratrix, in the sum of $ * * *, and in favor of Mrs. Patton, as Trustee, in the sum of $ * * *; and, as to the third-party complaint filed by the Baltimore and Ohio Railroad Company against the Duquesne Slag Products Company, we, the jurors empaneled in the above entitled case, find in favor of ——————.

   " '(Fill in blank space either with words "Baltimore and Ohio Railroad Company" *or* "Duquesne Slag Products Company".)

   " '[Instructions: Use this guide Only as assistance in filling out the verdict form. Select *either* "A" *or* "B". If you select "B", there are *3* blanks to be filled out.]' "