Jackson D. MAGENAU, Administrator
of the Estate of Norman Ormsbee, Jr., Deceased,

v.

ÆTNA FREIGHT LINES, Inc.

Civ. A. No. 433.

United States District Court
W. D. Pennsylvania.

Nov. 27, 1957.

William W. Knox, M. Fletcher Gornall, Erie, Pa., for plaintiff.

Gerald J. Weber, Erie, Pa., Fred Coope, Youngstown, Ohio, for defendant.

WILLSON, District Judge.

This diversity case was tried to a jury. Norman Ormsbee, Jr., was found dead about 11:20 P.M. on March 20, 1956 at the bottom of a winding S-curve near a wrecked tractor-trailer owned by Daniel Fidler and leased to defendant Aetna Freight Lines, Inc., and operated by it under its interstate commerce commission motor carrier certificate. So far as the evidence in this case shows, decedent was last seen alive as he entered the cab of the tractor between five and six P.M. of the same afternoon.

Decedent was born July 29, 1935, and thus was not yet 21 years of age at the time of his death. He left a wife 18 years of age and three children, ages 2 years, 1½ years and 6 months, all dependent upon him for their maintenance and support.

The jury returned a verdict for the plaintiff as administrator of decedent's estate in the sum of $76,400. Defendant has motions pending for judgment notwithstanding the verdict and for a new trial.

Whether decedent's status on entering the cab of the tractor was that of an invitee or an employee of defendant or a trespasser, was a contested point. This issue was raised in the pleadings, discussed at pretrial and controverted throughout the trial.

This case was called for pretrial on May 22, 1957 at Erie, and during the pretrial, counsel for the defendant called the court's attention to a motion for summary judgment which he had filed on April 4, 1957. As appears in the pretrial record, Gerald J. Weber, Esq., counsel for defendant, indicated to the court that the motion had been filed after the May, 1957 argument list had been published and he understood it would be considered at pretrial. It was considered at that time. The basis for the motion was that "the pleadings and depositions failed to allege and show that there was any relationship between decedent and defendant upon which defendant could be held liable for damages." The point was made that decedent was a trespasser and that at most, defendant owed the duty to refrain from wanton or wilful misconduct toward the decedent.

It is noticed at this point that the complaint averred that Ormsbee was riding as a guest passenger and invitee, having been offered a ride by the driver of the vehicle. It was mentioned at the pretrial that the evidence which plaintiff expected to produce would show first, that because of the alleged defective condition of the vehicle's brakes the driver was faced with an emergency which authorized him under the law of Pennsyl-vania to employ someone as an assistant and second, the proposition was discussed and plaintiff's contention was stated that assuming that plaintiff was a trespasser, nevertheless, this defendant is liable for his death if it engaged in reckless and wanton misconduct toward him under the circumstances. After considerable discussion on the two features mentioned, the court indicated that the pretrial should proceed, as the motion for summary judgment would be denied.

Thus it appears from the outset of this case, that defendant's position has been that decedent Ormsbee was a trespasser in the vehicle. Defendant has contended from the first that it did not hire decedent and that none of its employees had authority to engage decedent as a helper or assistant. In submitting the case to the jury, a special verdict was directed and in it the jury answered four interrogatories. The defendant's present contention is that by answering the first interrogatory in the affirmative, the jury has determined that Ormsbee, the decedent, was in the employ of the defendant and plaintiff therefore cannot recover in this case, but if plaintiff has any remedy, it is under the Workmen's Compensation Act of Pennsylvania, 77 P.S.Pa. § 1 et seq.

■ This court does not agree with defendant's contention that the affirmative answer of the jury to the first interrogatory establishes that decedent was hired as an employee or became a statutory employee of defendant.

The interrogatory reads:

"1. Under the evidence in this case, do you find that an unforeseen contingency arose which made it reasonably necessary for the protection of the defendant's interests that the driver, Charles Schroyer, engage the decedent, Norman Ormsbee, Jr., to accompany him for the remainder of the trip?

"Answer 'Yes' or 'No' Answer: Yes"

■ It should be mentioned that under the law of Pennsylvania and Federal

law, Aetna Freight Lines was responsible for the operation of the equipment under its I. C. C. certificate. See Kissell v. Motor Age Transit Lines, 357 Pa. 204, 53 A.2d 593; Interstate Commerce Commission Regulations, Section 207.4; and Rosu v. Law, 3 Cir., 193 F.2d 894.

The defendant concedes this point and did so at pretrial. Daniel Fidler, owner of the equipment, hired the driver Schroyer, and he had been in his employ for but two weeks before the accident. Although at pretrial the status of decedent's relationship with defendant was raised and discussed, the interrogatory to the jury was not so phrased as to require the jury to determine whether decedent was an employee of Aetna. Fidler leased the equipment and his driver Schroyer to the defendant. The tractor-trailer outfit left Syracuse, New York on March 13, 1956. It was loaded with 35,912 pounds of steel consigned to the Crucible Steel Company at Midland, Pennsylvania. The route was via Syracuse to Buffalo. Schroyer left Buffalo on the morning of March 20, 1956 on a route which took him to Erie and southwardly from Erie on Route 19 to Waterford, Pennsylvania, in this district. Schroyer stopped at Jones' Tavern. While there he complained of tractor trouble to Mr. Jones and specifically referred to trouble that he had had with his brakes. Schroyer also complained of brake trouble to one Herbert Brown in the tavern and offered him $25 if Brown would ride along with Schroyer to his destination. Brown refused. Thereafter Schroyer talked to Norman Ormsbee, Jr., plaintiff's decedent. According to Jones, the proprietor, who heard the talk, Schroyer promised to pay Ormsbee $25 if decedent would ride along with him. Both left the tavern and were seen entering the cab. Mr. Schroyer got into the driver's seat and the vehicle was seen to start toward the south on Route 19.

At approximately 11:20 P.M., State Police officers were called to investigate a fatal accident on Route 68 near Rochester, Pennsylvania. At the scene of the accident, the police identified the two bodies, one as the driver of the truck, Schroyer, and the other as plaintiff's decedent, Norman Ormsbee, Jr.

Thus, based on the evidence, Interrogatory No. 1 was simply to secure a finding from the jury as to the reasonable necessity of Schroyer engaging decedent to accompany him on the remainder of the trip in protection of defendant's interests.

■ This court holds, based on the jury's findings, that the law of this case is that the decedent Ormsbee was not a trespasser in entering the cab of the vehicle.

Under the facts shown in this case, the plaintiff is not barred from bringing this civil action under Pennsylvania law. See D'Alessandro v. Barfield, 348 Pa. 328, 35 A.2d 412, a decision of the Supreme Court of Pennsylvania on this point. In the D'Alessandro case, the Supreme Court had before it the issue as to whether a minor plaintiff at the time of the accident was the plaintiff's employee within Section 203 et seq. of the Workmen's Compensation Act. The minor plaintiff had been engaged by the driver of one of the defendant's vehicles used in early morning deliveries of milk. The boy had ridden on the vehicle with the knowledge of one of the owners. Nevertheless, the Pennsylvania court held that it was *only when the assistant is hired to perform services upon the employer's premises* that liability under the Workmen's Compensation Act applies. Recovery was permitted in a law action. That decision, together with Kissell v. Motor Age Transit Lines, supra, establishes in the case at bar the proposition of law that defendant is responsible for the negligent operation of the vehicle.

■ The two decisions together establish the further proposition that defendant is liable because the vehicle was operated under its I.C.C. certificate, for any damages resulting from negligence in the maintenance of the equipment and its operation with defective brakes, if such negligence was the proximate cause of decedent's death. Liability is imposed

because without the I.C.C. certificate, the interstate transportation of the cargo of steel in question in this case could not have been performed legally by the defendant. Thus defendant's motions for judgment notwithstanding the verdict and for a new trial based upon its contention that the remedy of plaintiff is under the Workmen's Compensation Act of Pennsylvania must be denied.

Although defendant in its motions assigns five reasons for a judgment notwithstanding the verdict and eighteen reasons for a new trial, in its brief the issues are divided into five categories. The first has been discussed. The remainder will be taken up in order.

II. Defendant Says There Is No Evidence to Sustain the Finding that Defendant Was Guilty of Wanton Conduct.

The court put this issue to the jury in the form of an interrogatory as follows:

"4. Was the Aetna Freight Lines, Inc. guilty of wanton conduct in failing to maintain the braking equipment on the vehicle in proper working order on the night of March 20, 1956, which wanton conduct was the proximate cause of the death of Norman Ormsbee, Jr.?

"Answer 'Yes' or 'No'  Answer Yes"

The charge of the court on this phase of the case was based upon Section 500 of the Restatement of Torts, which was read to the jury.

Defendant asserts that the only evidence showing any connection of the defendant Aetna with the defective truck occurred in the trailer terminal at Buffalo where the terminal manager made an inspection of the truck and brakes. Defendant also makes the point that the rule of the Pennsylvania cases on wanton misconduct requires a test of foreseeability of danger to a known or identified party. Defendant cites Cover v. Hershey Transit Co., 290 Pa. 551, 139 A. 266, and Slother v. Jaffe, 356 Pa. 238, 51 A.2d 747, and the Pennsylvania Annotation to the Restatement of Torts, Section 500. Defendant also says that actual knowl-

edge of the peril involved is an essential element of wanton negligence. See Tanner v. Pennsylvania Truck Lines, 363 Pa. 136, 69 A.2d 366; Kasanovich v. George, 348 Pa. 199, 34 A.2d 523; Engle v. Reider, 366 Pa. 411, 77 A.2d 621; and Peden v. Baltimore & O. Railroad Co., 324 Pa. 444, 188 A. 586.

On this point defendant's position is based upon the Restatement of Torts, Section 500, *Comment b*, entitled "Perception of Risk," as well as the cited cases, and the Pennsylvania Annotation to the Restatement of Torts, Section 500, page 255, where the quotation is found: " * * * This definition makes 'wanton' the equivalent of want of reasonable care in the presence of a known trespasser whose peril is also known."

However, under the facts in this case, it is believed that defendant's position is incorrect. The cases cited refer generally to persons on rights of way whose presence is known. This court agrees with plaintiff's counsel that defendant has only cited *Comment b* under Section 500 where the illustration given is the failure to inspect brakes. This does not deal with a situation such as in the case at bar where it is known that something is wrong with the brakes. It is believed that this case falls under Sections "c" and "d" of the Restatement, which refer to the extent and gravity of the risk. Under "c," the paragraph concludes: " * * * It is enough that he knows that there is strong probability that others may rightfully come within such zone * * *."

And also, under "d," referring to knowledge of presence of others within danger zone, " * * * It is enough that he knows that there is strong probability that others may rightfully come within such zone * * *."

III. Defendant Says There Is Insufficient Evidence on the Issue of Proximate Cause.

Defendant's position on this issue is stated in its brief as follows:

"The record in this case is absolutely devoid of any evidence of the

cause of this accident. All that we know is that the truck was found turned over on the bank of a hill beside and below the highway. There were no skid marks, there were no marks of any kind explaining the cause of the accident on the highway. There was not even any evidence to show that any brake trouble developed such as a dragging wheel, a burning of brakes or other trouble. The cause of the accident could have been just as well due to undue speed, being forced off the highway by oncoming or passing traffic, or many other reasons."

■ This court has in mind the familiar principles to be applied in considering the motion for judgment notwithstanding the verdict. The plaintiff has the verdict of the jury. The evidence is to be considered in the light most favorable to him, together with the reasonable inferences to be drawn therefrom to determine whether a right to recover exists. Marsh v. Illinois Cent. R. Co., 5 Cir., 175 F.2d 498; and Downey v. Union Paving Co., 3 Cir., 184 F.2d 481.

Under defendant's II and III, the evidence of negligence, wanton conduct and proximate cause is as follows:

At the time and place of the accident, the road was dry, the weather was clear and there was no snow or ice on the pavement. Visibility was good. There were no skid marks on the pavement of the roadway, nor on the berm. The tractor-trailer had gone halfway through a downhill S-curve, at which point it left the road to the right, going down over an embankment where it turned over, coming to rest against a tree. Tire marks did, however, indicate the course or path that the vehicle took on leaving the pavement. It ripped out eight guardrail posts, broke a telephone pole and came to rest a distance of 202 feet from where the first guardrail was struck. There were tire marks on the berm indicating that the truck had traveled a distance of 60 feet before hitting the telephone pole.

After the accident, the rig was towed to Rosenberg's Garage in Beaver Falls, Pennsylvania. There one Joe Bushless was engaged by the Interstate Commerce Commission to conduct an investigation of the braking system of the wrecked vehicle. He was assisted by one Charles Novak and other I.C.C. men. The investigation took some four and one-half hours.

The witness found that the airbrake system, that is, the rubber diaphragms inside the wheels, was in working order. He determined this by removing some 28 bolts and pulling the so-called "pancakes" apart. Next, the witness examined two of the trailer wheels. The brake lining was "down" on both of them. In speaking of lining, the witness said, "They weren't completely off, clear off, they were worn down to the cam, until the cam was turning over on them." The cam had turned down on the right rear wheel but was still working on the left wheel.

The witness stated that the turning over of the cam results when the brake lining goes down so far "that the cam turns over and locks the wheel" when the brakes are applied.

Bushless had thirty years experience as a mechanic and stated that he was familiar with the Pennsylvania requirements and that the trailer brakes would not pass Pennsylvania minimum inspection requirements.

All of the wheels were not inspected, but according to Bushless, he only inspected the two mentioned for the reason that the brakes on the opposite side of the axle from the examined brakes are usually in the same condition.

As mentioned, the driver Schroyer picked up his load at Syracuse on March 16, 1956. Due to bad weather, tire trouble at Batavia, New York, and a dead battery at Buffalo, New York, he was delayed for several days until on March 20, 1956, he was no further along on his journey to Midland, than Buffalo, New

York. On that morning, Schroyer appeared at the Aetna Freight Line Terminal in Buffalo and there he told Mr. Rice, the terminal manager, that among other difficulties, his brakes were giving him trouble in that they did not take hold fast enough. Mr. Rice then conducted an inspection to determine whether or not the brakes were applying properly.

The inspection by Mr. Rice consisted of the following: he had Schroyer pull the air brake hand valve down while the truck was standing still in order to determine whether or not the arms would move, which they did. He then got into the cab of the truck and pulled the truck ahead and then he tried the hand valve which applies the trailer brakes only, and discovered that it worked to his satisfaction. Next he put the truck in low gear with the hand valve still down and attempted to pull the truck ahead. The truck did not move. Mr. Rice then drove the truck 300 to 400 feet over a level blacktop driveway at a speed not exceeding 7 miles an hour and at that speed, he applied the brakes.

Plaintiff offered an expert, one Carl Mayr, as a witness. Mr. Mayr had had 36 years experience as a mechanic, with 22 of those years involving work with tractors and trucks. The witness operated a Mack tractor agency for three years. He was familiar with the Gramm trailer, having repaired them in the past. His testimony was that the proper procedure for inspecting the brakes of a tractor-trailer, such as the one in this case, is to remove the dust shields or brake shields which protect the brakes from getting dirt, sand and general foreign matter into them. If these are riveted on, then the whole wheel must be removed. The removal of these shields allows the inspector to get a good view of the braking mechanism and the brake lining. In inspecting a tractor-trailer such as this, one shield on a wheel must be removed from each axle, that is, one from the front axle and one from the rear axle. Generally, the one on the low side of the road is pulled first and if it looks defective, then all the wheels are pulled. The minimum procedure to follow in order to properly inspect these brakes is to put your fingers through what is approximately a 3-inch space so that you can feel the drum and lining and thus determine the thickness of the brake lining. With both these inspection procedures, it is necessary to get underneath the truck. This witness was permitted to answer a hypothetical question based upon the assumption of the truth of certain facts in the testimony relating to the braking equipment. In response to the question put to him, this witness said that the brake linings "were worn out" at the time the equipment left Buffalo.

In order to service, maintain, repair and inspect their equipment, the defendant operates a station located in Girard, Ohio. This station has the total of three men, a Mr. Trask and two assistants who do all the maintenance, repair, servicing and inspecting of the defendant's huge fleet of some 300 pieces of leased and owned equipment consisting of tractors and trailers, that are used in the hauling of goods in interstate commerce. This evidence was introduced on the theory that defendant did not maintain servicing facilities nor employees who could adequately maintain and keep in repair its vehicles. It is noticed in this regard that the I.C.C. regulations which are incorporated in Title 49, Code of Federal Regulations, "Transportation," Subpart C—Brakes, Section 193.40, requires adequate brakes on all motor vehicles and Section 196.2 requires each motor carrier to systematically inspect and maintain all motor vehicles to insure that accessories are in safe and proper operating condition. Section 196.9 requires motor carriers to maintain systematically inspection and maintenance records.

In connection with the testimony of Mr. Rice, defendant's agent at Buffalo who tested the brakes, it is noticed that Section 193.52, "Brake Performance," requires that the service brakes under all conditions of loading must be able to

bring the vehicle to a stop at a distance of 30 feet from a speed of 20 miles per hour when tested on a dry, smooth, level road, free from loose matter. Mr. Rice's test, it is apparent, did not show that the brakes measured up to this requirement.

Thus a recital of the evidence in the light most favorable to the plaintiff makes it apparent that judgment notwithstanding the verdict must be denied. See Magee v. General Motors Corp., 3 Cir., 213 F.2d 899.

Upon the whole evidence in the case there is a firm foundation for a finding that an unforeseen contingency arose which made it reasonably necessary for the protection of defendant's business that Ormsbee be engaged to accompany the driver for the remainder of the trip. On this phase of the case it is not to be overlooked that the driver Schroyer was the employee of Fidler. Fidler had no strict rule which prevented Schroyer from engaging help. According to Fidler, Schroyer had the authority to hire services and purchase necessities along the way without communicating with him. Defendant through Fidler and Schroyer is responsible to third persons for the ordinary negligence of Schroyer in operating the vehicle as well as the ordinary negligence of Fidler in maintaining and repairing the vehicle. Under the evidence the jury found that Ormsbee was lawfully on the truck. The defendant owed him the duty to use ordinary care and was liable for ordinary negligence. An inference of negligence can be found in the manner in which the tragic accident occurred. The vehicle was going downhill on a dry road on a clear night. It left the pavement, knocked out guardrails, crashed into a tree, after breaking off a telephone pole. In the operation of the vehicle as far as negligence is concerned, Schroyer is defendant's driver, and permitting his vehicle to leave the highway and overturn under the unexplained circumstances is negligence. See Kotal v. Goldberg, 375 Pa. 397, 100 A.2d 630; Shafer v. Lacock, Hawthorn & Co., 168 Pa. 497, 32

A. 44, 29 L.R.A. 254; Eisenhower v. Halls Motor Transit Co., 351 Pa. 200, 40 A.2d 458 and Lacaria v. Hetzel, 373 Pa. 309, 96 A.2d 132.

Of course, in addition to the inference of negligence as shown by the circumstances, the lack of braking power on the equipment is ample support for plaintiff's contention that defendant was negligent. Defendant itself was required to make an inspection before putting the vehicle on the highway, even though the equipment was leased from Fidler. The leasing regulations of the I.C.C., Section 207.4 (c), require that before the authorized carrier takes possession of the equipment it is required to inspect the same in order to insure that the equipment complies with parts 193 and 196 of the Motor Carrier Safety Regulations. Defendant did not contend nor offer evidence that it made the inspection required under the Section. It was required under the regulations to maintain records of inspections, yet no evidence was offered that it had records of inspection of the braking equipment. It offered Fidler's testimony that he had put new lining on the trailer brakes in December, 1955, but this testimony was simply not accepted by the jury. This issue of fact as to the braking equipment was left to the jury in the second and third interrogatories and the jury finding was against defendant.

As to the wanton conduct of defendant failing to maintain the braking equipment on the vehicle in proper working order, the fourth interrogatory was submitted to the jury on this feature of the case and again the jury found against the defendant.

■ Considering the size and weight of the loads carried, the size and weight of this particular trucking equipment on the highway, the traffic conditions on the highways of the country and the foreseeability that tremendous damage and loss of life is likely to occur in the event that braking equipment on vehicles such as the one in question is not in a good state of maintenance and repair permits

a finding of wanton conduct on the part of the defendant in this case. As mentioned, such a finding is not required to sustain the verdict. It can be sustained on ordinary negligence alone. Defendant having raised the point, it is still of no assistance in relieving it from the verdict and judgment. The conclusion of this court is that there is ample evidence of negligence, ample evidence of wanton conduct, either of which, or both concurring, was the proximate cause of decedent's death.

IV. Defendant Says the Verdict Is Excessive and Is Not Supported by the Evidence.

It is noticed on this phase of the case, defendant cites Patton v. Baltimore & O. Railroad, D.C., 120 F.Supp. 659, Armstrong v. Berk, 96 F.Supp. 182 and several Pennsylvania decisions, one of them DeSantis v. Maddalon, 348 Pa. 296, 35 A.2d 72, and others. Defendant contends that the evidence in the case discloses that the decedent had a very uncertain record of employment, that he had worked at several jobs for short periods of time with long intervals in between. Defendant says that he depended on his parents for support, food and clothing for his family. Defendant claims that no rate of pay was established. Defendant says that decedent's financial prospects were not attractive, as he had limited schooling, no arts or skills, and there was no indication of his becoming a steady worker.

Plaintiff, on the other hand, points to the testimony which indicates that decedent had a special skill as a mechanic, even considering his age. He was not yet 21 years old, but was married and had three children. Necessarily he had no long record of earning. Also, necessarily, says plaintiff, it is reasonable to rely on an inference that decedent had not reached the peak of the period of his earning capacity. When the amount of the verdict was announced by the jury, as trial judge I felt that its size was reasonable, considering the evidence as to decedent's age, the degree of responsibility that he had already accepted as a young man and his tendency, as shown by the evidence, to engage in remunerative employment or occupations. It is true the evidence shows that he had not worked long at one place or engaged in one type of activity for too long a period. It is felt, however, that this was but natural under the circumstances, considering his age. He had employment from time to time and was maintaining his family. He had demonstrated an earning capacity and aptitude for working in the mechanical field. It is reasonable to expect that this decedent had not yet reached the full peak of his earning power.

It is interesting to observe that while defendant's motions were under consideration, a decision of the Court of Appeals for this Circuit in Lebeck v. Jarvis, Inc., 250 F.2d 285, 288, was published. The court had under consideration a contention that a verdict was excessive. Judge Hastie said:

" * * * But otherwise, any claim that the verdict has been excessive requires a trial court to decide no more than whether the jury has reached a result which could rationally and dispassionately be reached by laymen on the basis of evidence relevant to the several categories of legally recoverable damage."

In the present case, the several categories of damages other than funeral expenses are simply the pecuniary losses suffered first by the wife, and next by each of the three children. The decedent himself had a life expectancy of over forty-six years. He left a widow eighteen years of age. Under the Wrongful Death Act of Pennsylvania, a damage award such as the one in the present case is to be shared by the wife and minor children in the proportion they would take the decedent's personal estate in case of intestacy. 12 P.S. § 1602. Deducting expense items such as funeral,

the jury award of approximately $75,000 in this case, if the verdict stands, will be shared by the widow and the three minor children. The wife's share is $25,000. Each of the children will have a share of $16,666. The child William was approximately two years old at the time of his father's death. William has lost support for a period of 16 to 18 years. Norma Jean was one year eight months old and has been deprived of support for 17 to 19 years. Carol Ann was not yet one year old and it can be assumed that she has been deprived of the support of her father for a period of from 18 to 20 years. Such items of damage are legally recoverable under the law of Pennsylvania and the amount of the verdict appears reasonable under all of the circumstances.

■ Two matters remain for mention. The first relates to defendant's objection to the admission of the testimony of Messrs. Brown and Jones as to the conversation between Schroyer, the driver, and other persons at the Jones Tavern. Schroyer, in the conversations about which the jury was permitted to hear testimony, related to the witnesses the condition of his brakes and the general difficulties he was encountering on the trip. He was seeking assistance. It is to be remembered that here was an employee within the course of his employment, in the process of performing his duties. It was not the case of an agent admitting possible liability after an accident. It is believed that the testimony was properly admitted Schroyer was dead at the time of trial. Henry on Pennsylvania Evidence, Section 448, says: "* * * Oral or written statements made by a person in the regular course of his business or professional duty are competent after his death, if made of his own knowledge and at or near the time the act was performed." It is believed that the testimony was properly admitted also, under Section 1523, et seq., of Wigmore on Evidence as being in the regular course of business. It also appears under the evidence in this case that there was no motive on the part of Schroyer to misinterpret the situation as to his brakes at the time of the conversations which were admitted in evidence.

■ Secondly, defendant says the court erred in submitting the issue of wanton conduct to the jury since the plaintiff had not properly raised this issue in his complaint. A short answer to this contention by the defendant is Rules 15(b) and 16 of the Federal Rules of Civil Procedure, 28 U.S.C. Rule 15(b) says when issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. The pretrial record will show that the issue of decedent's being a trespasser and of wanton conduct on the part of defendant first was raised by defendant's motion for summary judgment. At pretrial, as previously indicated, the contentions and the evidence to be presented on these issues were reviewed with the plaintiff's counsel stating substantially what plaintiff's evidence on these points would be. There was no objection by defendant's counsel at that time on the ground that the pleadings did not allege wanton conduct on the part of the defendant. The objection was first taken during the trial when such evidence was offered. Under the circumstances, defendant was not prejudiced. It had ample notice of plaintiff's proof.

■ Finally, on review of the issues and the evidence in this case, this court is satisfied that there is substantial evidence in support of the jury verdict. This court believes that the weight of the evidence favors the plaintiff and that plaintiff's evidence is credible. The verdict is one permitted under all of the evidence introduced and as this court believes that justice has been done, a new trial will not be granted. Magee v. General Motors Corp., supra, and Eastern Air Lines v. Union Trust Co., 99 U.S. App.D.C. 205, 239 F.2d 25.